UNITED STATES, Appellee

v

MARSHALL W. GRIFFIN, JR., Private,
U. S. Army, Appellant

17 USCMA 387, 38 CMR 185

No. 20,489

February 9, 1968

*Captain Raymond A. DiLuglio* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker, Major David J. Passamaneck,* and *Captain Gerald F. Richman.*

*Captain William R. Steinmetz* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major John F. Webb, Jr.*

### Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Flak Kaserne, Augsburg, Germany, upon charges of larceny, robbery, assault, and two counts of wrongful communication of a threat, in violation of Uniform Code of Military Justice, Articles 121, 122, 128, and 134, 10 USC §§ 921, 922, 928, 934, respectively, the accused was found guilty of wrongful appropriation and one specification of communicating a threat. He was sentenced to bad-conduct discharge, forfeiture of $86.00 per month for twelve months, and confinement at hard labor for a like period. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon two assignments of error, which will be hereinafter discussed.

I

The chief prosecution witness, Specialist Four Morse, testified by deposition. He declared the accused entered his room at approximately 1:30 a.m. on August 8, 1966. Griffin turned on the lights and shouted "reveille." Morse informed him it was too early for

**387**

reveille, whereupon Griffin approached his bed, turned it over, and dumped him on the floor. As Morse was picking up his bedding, he was grabbed by the throat and shoved against the wall. Griffin began to choke him and demanded twenty dollars. Morse replied he did not have twenty dollars, whereupon Griffin ordered him to turn over his footlocker key. At the same time, he placed his hand in his pocket as if he were armed.

Morse refused to open his footlocker, and Griffin forced him to give up his key, opening the locker himself and seizing a twenty-dollar bill from it. It appeared to Morse that Griffin was accompanied by another soldier who, however, remained in the hall. Griffin threatened to "fix me so I would never talk again" if the incident was mentioned to anyone and also to "fix" the Charge of Quarters if he were notified. He then departed.

Frightened, Morse remained in the room for the balance of the night, but reported the matter to his platoon sergeant at about 6:00 a.m. His roommate, Private Hill, slept through the entire incident and heard nothing. Griffin smelled of alcohol and appeared intoxicated.

Morse conceded, in a statement made on August 8 to criminal investigators, that he had declared that he himself opened the footlocker and handed the money to Griffin. However, this was not correct, and the earlier statement was made because he "was pretty well shook up and scared."

On the same morning, Private Griffin asked Morse if he had gotten anything from him the previous night. Morse told him he had taken twenty dollars. On payday, Griffin repaid that sum to him.

Other witnesses indicated the accused, intoxicated, visited several rooms on the night in question, shouting "reveille," and attempting to obtain money. His own testimony relates a considerably different version of what transpired with Morse. According to Griffin, he entered the room and tried unsuccessfully to awaken accused's roommate. Morse was awake, so he asked him for a loan. Morse denied having any cash, but finally admitted he had a twenty-dollar bill. He said he would get change from the Charge of Quarters, but, "because he don't have his clothes on," accused offered to get it for him. Accused used no force, nor did he dump Morse's bed, strike him, or in any manner choke him. Morse voluntarily loaned him five dollars, and he did not return with the change. As he was drunk, accused could not remember why he did not return; whether he did go "to try to get the change or went right up to my room." He woke up the following morning in his own bed, fully clothed, and possessed of less than two dollars.

Thereafter, he asked Morse if he had gotten any money from him and told him he would repay the loan on payday. Subsequently, he did so.

## II

The first issue before us inquires whether the law officer erred prejudicially in advising the court as follows:

"In the present case, certain testimony has been read to you by the way of a deposition. You are instructed that you are not to discount this testimony for the sole reason that it comes to you in the form of a deposition. *It is entitled to the same consideration, the same rebuttal, the presumption that the witness speaks the truth and the same judgment on your part with reference to its weight as is the testimony of witnesses who have confronted you on the witness stand."* [Emphasis supplied.]

The instruction is clearly erroneous and, in light of the substantial factual questions presented and other circumstances, prejudicial to the substantial rights of the accused. First, we note the advice directed the court to treat the deponent's credibility as if he had appeared before it in open court and confronted the members. Yet, it is obvious he had not done so, and one of the first considerations in credibility is the opportunity for the finders of fact to observe the demeanor and behavior of the witness who appears before

them. See, for example, Code, supra, Article 66, 10 USC § 866, which admonishes the boards of review, in weighing questions of fact, to recognize "that the trial court saw and heard the witnesses." Though, in United States v Jacoby, 11 USCMA 428, 29 CMR 244, we construed Code, supra, Article 49, 10 USC § 849, to permit the taking of oral depositions in the presence of the accused and thereafter to be read in evidence at his trial, we referred at length therein to the value of having the court itself hear the witness. So, also, in Mattox v United States, 156 US 237, 39 L ed 409, 15 S Ct 337 (1895), the Supreme Court likewise alluded to the purpose of compelling a witness "to stand face to face with the jury *in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.*" (Emphasis supplied.) *Mattox, supra,* at page 242.

More importantly, the instruction is also defective in referring to the deponent as being entitled to "the presumption that the witness speaks the truth," as if he had testified in court. No case is called to our attention which approves the unexplained use of such a presumption in a criminal case. To the contrary, it has been repeatedly condemned.

Thus, in United States v Meisch, 370 F2d 768 (CA3d Cir) (1966), the court stated, at page 773:

". . . It is perhaps safe to say that the vast majority of witnesses speak the truth and that jurors are aware of this. But we have not found an authoritative case, and the prosecution has cited none, casting that tendency of human nature into a legal presumption in a criminal case tried to a jury. In addition to derrogating from the jury's sole right to determine the credibility of witnesses, this rule conflicts with the presumption of innocence of a defendant."

See, also, United States v Johnson, 371 F2d 800, 804 (CA3d Cir) (1967).

We have long condemned the reference to presumptions in instructions without explanation of their meaning in terms of justifiable inferences. See United States v Ball, 8 USCMA 25, 23 CMR 249. In like manner, there was no explanation here of the manner in which this "presumption" of speaking the truth might be overcome. United States v Persico, 349 F2d 6 (CA2d Cir) (1965), points out that, at the very least, such should be included so "the jury is free to determine the credibility of the witnesses." *Id.,* at page 12. See, also, United States v Bilotti, 380 F2d 649 (CA2d Cir) (1967).

In sum, we are here presented with a case in which the two principal witnesses told opposing versions of what occurred. The law officer, in effect, told the court both were "presumed" to speak the truth, without explaining in any manner how the dilemma in which this "presumption" placed the court might be resolved. He specifically added to the weight of the Government's deponent by incorrectly advising the court that the latter's failure to confront the fact finders was to be disregarded. Under such circumstances, and in light of the conflicting evidence, we must conclude, as noted above, there was a fair risk of harm to accused's substantial right to have the court properly judge the credibility of all witnesses. United States v Meisch; United States v Persico; Mattox v United States, all supra. The erroneous instruction was, therefore, prejudicial and reversal is in order.

III

The remaining issue deals with the admission in evidence of accused's pretrial statement over objection that he had not been advised of his right to appointed counsel or to secure the services of individual counsel at his own expense. See United States v Pearson, 17 USCMA 204, 37 CMR 468; United States v McCauley, 17 USCMA 81, 37 CMR 345; and United States v Hardy, 17 USCMA 100, 37 CMR 364. In light of the fact that the erroneous instructions discussed above require reversal, we need not resolve this issue. Suffice it to say that, at any rehearing, the

Government would be well advised to spell out the nature of the warning given with greater specificity than is done herein. Thus, by making a complete record and avoiding the use of conclusory language, unnecessary reversals may be avoided. Without determining, therefore, whether such be the case here, we pass the question.

The decision of the board of review is reversed, and the record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN and Judge KILDAY concur.