UNITED STATES, Appellee

v

SAMUEL P. McCAULEY, JR., Private,
U. S. Marine Corps, Appellant

17 USCMA 81, 37 CMR 345

*Lieutenant J. Arthur Bruno,* USNR, argued the cause for Appellant, Accused. With him on the brief was *Captain John P. Gleeson,* USN.

*Commander Walter F. Brown,* USN, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Jean E. Van Slate,* USN.

## Opinion of the Court

KILDAY, Judge:

Appellant was arraigned before a general court-martial at the Marine Corps Recruit Depot, San Diego, California, charged with desertion terminated by apprehension, in violation of Article 85, Uniform Code of Military Justice, 10 USC § 885. He pleaded not guilty of the offense charged but guilty of absence without leave, the lesser included offense. He was found guilty of desertion as charged and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The convening authority approved the sentence. A board of review in the office of the Judge Advocate General of the Navy affirmed the finding of guilty and the sentence.

The Court granted appellant's petition for further review in order to consider whether or not:

The Government failed to properly advise the accused of his constitutional right to counsel prior to obtaining certain incriminating statements from the accused.

In the recently decided case of United States v Tempia, 16 USCMA 629, 37 CMR 249, this Court held, for cases tried on or after June 13, 1966, that the principles enunciated by the Supreme Court in Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), applied to military interrogation of criminal suspects. Private McCauley was tried June 20, 1966. The issue now before us must be considered in light of *Miranda* and *Tempia,* both supra.

Agreed facts in this record of trial show that appellant arrived in the continental United States at San Diego, California, from Naha, Okinawa, on October 15, 1964. He was ordered to report to the Marine Corps Schools, Quantico, Virginia, by November 26, 1964. This order was never obeyed and during his entire period of absence from the Marine Corps McCauley remained within the limits of San Diego and Los Angeles Counties, California.

The question now before us has its genesis in the testimony of Federal Bureau of Investigation Special Agent McLeod, called as a witness for the prosecution. McLeod informed the court-martial that on April 18, 1966, he talked to McCauley regarding the latter's failure to possess a Selective Service card, a violation of 50 USC App §§ 454 and 462.

From the record, it appears that McCauley was, at the time of interrogation, confined in the San Diego County Jail under the name of Richard Anthony Jackson. His failure to possess a draft card caught the attention of the jail captain and caused him to inform McLeod of this apparent violation.

This Federal agent testified he had prefaced his interrogation by advising the accused "that he did not have to say anything; that anything he did say might be used against him in court; that he had the right to talk to a lawyer of his choice or anyone else before saying anything." An oral statement, thereafter reduced to writing, was thus obtained.

Cross-examination of this witness brought forth the following colloquy:

"Q. Did you specifically tell him that he had a right to counsel, either retained or appointed?

"A. In those words?

"Q. Basically in those words, yes, sir.

"A. No, sir.

"Q. You did not. Do you recall if you told him at all that he could have an appointed counsel if he could not retain. . . .

"A. No, sir.

"Q. Did you tell him that he had the right to have an attorney present at any interrogation?

"A. I don't understand your question.

"Q. Did you tell McCauley that he had the right to have an attorney present at any interrogation conducted by you?

"A. No, sir.

"Q. You did not. Did he specifically verbally waive the right to have, one, an attorney in any event, and, two, did he agree to being interrogated?

"A. Well, not—he did not say in so many words, no, sir."

Thereafter, defense unsuccessfully resisted the admission of oral statements made by the accused, contending that McLeod's warning on the matter of self-incrimination was inadequate. With the law officer's favorable ruling, prosecution showed that appellant had identified himself as Jackson—a Marine Corps veteran owning an honorable discharge for active duty from August 23, 1958, until August 22, 1963. Accused further admitted to McLeod that he might have registered for Selective Service under the name of McCauley, having used that name in the past. Since registering, however, he had legally changed his name. Armed with this information, McLeod terminated the interview and returned to his office where he searched his files. Under the name McCauley, he found "an old deserter case that had been referred to us by the Marine Corps." Pressing the matter further, McLeod was, the next day, informed by FBI Headquarters that the McCauley case was still outstanding. He, in turn, informed local authorities, including the Shore Patrol, of appellant's true name and status. He advised the jail authorities to turn the petitioner over to the Shore Patrol "when he had completed his civilian sentence." Indeed, on the 19th of April, the accused was, in fact, turned over to the Shore Patrol as a "county jail release."

To the issue at hand, Government presents a bifarious argument. Without benefit of United States v Tempia, supra, since published, they have contended first that military law is not affected, in the area under consideration, by constitutional limitations; consequently, the declarations of Miranda v Arizona, supra, in no sense govern the situation found here. It should be noted that the Judge Advocate General of the Navy fostered the same comment in *Tempia*. We reject the argument now, as we did in *Tempia*, for the reasons there enumerated. Nothing is gained by belaboring this point further.

In its second phase, the Government, assuming *Miranda's* applicability, believes that the particular circumstances of this case place it beyond the scope of the Supreme Court's opinion. They entertain the view that Agent McLeod's interrogation was not custodial in character; accused not having been taken into custody or otherwise deprived of his freedom of action in some " 'significant way' both *prior* to his interrogation and *incident* to the offense of which he was interrogated."

Said to corroborate this contention are those cases wherein the investigator comes to one's home or office by invitation (United States v Hill, 260 F Supp 139 (SD Calif) (1966); United States v Fiore, 258 F Supp 435 (WD Pa) (1966)); where the accused is invited and voluntarily goes to the investigator's office (United States v Knight, 261 F Supp 843 (ED Pa) (1966)); where the accused is only momentarily detained by law enforcement authorities (White v United States, 222 A2d 843 (1966); United States v Davis, 259 F Supp 496 (D Mass) (1966)); and, situations where freedom of movement is restricted only

because of illness or injury (People v Tanner, 35 U. S. Law Week 2287, November 14, 1966). It is an easy matter for the Government to characterize the appellant's statement as having been volunteered in the sense that it is exculpatory in nature, not of the whole cloth, and designed solely to escape the clutches of the county sheriff as well as the FBI. Failure to warn is, therefore, considered to be immaterial to the admission of McCauley's statement into evidence.

Taking still another tack, Government theorizes that in this factual situation the warning given was not required by FBI procedures for accused was not "'under arrest for an offense under FBI jurisdiction.'" Even so, the warning, as given, is said to satisfy FBI requirements, broadened by the "Criminal Justice Act of 1964," as well as the rule announced in *Miranda*.

Most assuredly, *Tempia*, supra, should make clear our standing on these matters. We there said of custodial interrogation that the "test to be applied is not whether the accused, technically, has been taken into custody, but, absent that, whether he has been 'otherwise deprived of his freedom of action in any significant way.'" Directed to the particular facts of that case, it is but a restatement of the *Miranda* rule that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, supra, at page 444. It is self-evident that, unlike the Government, we fail to see nuances limiting the rule, for in truth the subtleties of Escobedo v Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964), have instead been broadened in meaning by *Miranda*, supra. Indeed, statements considered admissible under the former have been described as inadmissible under the latter. This is the rationale of State v Shoffner, 37 Wis 2d 412, 143 NW2d 458 (1966), directed to an exchange between that accused and an arresting officer made while both were waiting at a police call box. The cases relied on by the Government, cited above, are

not here apropos in light of the fact that this petitioner was institutionalized and suspected of offenses.

Mathis v United States, decided April 28, 1967, 35 U. S. Law Week 2644–2645, on which my dissenting brother relies, is similarly inapposite. It does not, in my view, support the contention that sentenced imprisonment, of itself, precludes possible subjugation to overbearing psychological pressures as contemplated by *Miranda*, supra. Moreover, the similarity of *Mathis* with Westover v United States, 384 US 436, 494, 16 L ed 2d 694, 735, 86 S Ct 1602, 1638 (1966), hereinafter discussed, is such as to make that conclusion proscriptive.

The *Miranda* rule and its distinctions have been given meaningful expression in the case of People v Allen, 50 Misc 2d 987, 272 NYS2d 249, 255, with these words:

"The new standard is *'compulsion'* —not 'coercion' under the 'traditional' rule, or 'critical stage' under the 'no counsel' rule. The state and federal decisions heretofore discussed are no longer relevant since they speak in terms of 'focus' and 'accusatory stage' terms which trigger the 'critical stage.'

"'Compulsion' under the Fifth Amendment and its State counterpart does not have its precise dictionary meaning. It has no relationship to 'coercion' and is applicable in many settings not related to any 'critical stage.' Compulsion is simply questioning in any setting (civil proceeding, administrative or departmental hearing, grand jury and all court proceedings) where a criminal fact may be elicited.

"For example in New York, one subpoenaed before a general investigating grand jury is deemed 'compelled' if he answers any inquiry. It is difficult to see how anyone 'arrested' is less 'compelled.'

"I read *Miranda* to hold that the mere 'fact of custody' is inherently 'compulsive' in its Fifth Amendment sense; that as soon as a person is deprived of 'his freedom of action' adversary proceedings commence and

the privilege protects him from questioning, routine or otherwise, which seeks to elicit a criminal or clue fact. The safeguard of the privilege applies as fully as it does before the grand jury or at the trial.

"To summarize, what the Court has done is to move the commencement of 'adversary proceedings' to the point of 'custody'—backwards from 'focus' in point of time. This the Court deemed essential when 'compulsion' rather than 'critical stage' became the new test.

"*Miranda's* precise language, it seems to me, does not permit of any other conclusion. . . ."

This tenet reflects with exactness the position taken by this Court in *Tempia*. Consonant with such views are those opinions that declare in equal fashion:

" '. . . In my view, the test whether there is "custodial interrogation" ' under Miranda v Arizona, 384 US 436, 34 LW 4521, 'is rather the belief of the person under interrogation as to whether he is in custody.' The rationale for requiring procedural precautions to insure compliance that the privilege against compulsory self-incrimination is the thesis that compulsion is inherent in custodial surroundings." [People v Colleran, 35 U. S. Law Week 2540; see, also, People v Kelley, 57 West's Cal Rptr 363, 375, 424 P2d 947 (1967).]

These same cases have muting effect upon the suggestion that so-called exculpatory statements are necessarily voluntary. On this facet of the problem, *Miranda* proclaims:

". . . The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement. In *Escobedo* itself, the defendant fully intended his accusation of another as the slayer to be exculpatory as to himself." [*Ibid.*, at pages 476–477.]

That McCauley was not fully warned by Agent McLeod should no longer be in doubt. Missing from his warning was the required advice that appellant had "a right to the *presence* of an attorney, either retained or appointed." (Emphasis supplied.) *Miranda*, supra, at page 444. McLeod conceded, as we have hereinbefore shown, that he had failed to carry his advice to this necessary end. The warning given was, therefore, defective. In so concluding, we make no assessment of warning requirements demanded by the Federal Bureau of Investigation of their agents. All that need be said here is that the right to the presence of counsel is, in fact, a cautionary requirement and when so tested, McLeod's advice is substandard. In point of fact, this is the very advisory defect that brought about reversal in the *Miranda* case, and we are required to accord the omission the same dignity here.

Also similar is Westover v United States, 384 US 436, 494, 16 L ed 2d 694, 735, 86 S Ct 1602, 1638 (1966), a companion case of *Miranda*, decided the same day. On the evening of March 20, 1963, Westover was arrested by Kansas City police as a suspect in two local robberies. Interrogated that night and the next morning by these authorities, he was then turned over to agents of the FBI who questioned him regarding the robberies of a California bank and a savings and loan association. Nothing in the record indicated that Westover had been warned of his rights by Kansas City police. At his trial and conviction in Federal court of the California robberies, Federal agents

testified, and a paragraph in each of two confessions showed, that these interrogators had advised Westover "that he did not have to make a statement, that any statement he made could be used against him, and that he had the right to see an attorney." (*Ibid.*, at page 495.) The Supreme Court reversed Westover's conviction with these words:

"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege." [*Ibid.*, at pages 496–497.]

In sum, we find the Government failed to properly advise the accused of his constitutional right to counsel prior to obtaining certain incriminating statements from him.

We are concerned at the moment only with the issue at hand and the accompanying facts. We foresee little impact upon the armed services for, as pointed out in United States v Tempia, supra, there is in existence a "complete, functioning system of appointed counsel." It is simply a matter of moving the date of appointment of counsel back to the custodial stage. Nonetheless, we leave for future determination such auxiliary or collateral matters as the effect of *Miranda* upon paragraph 140a, Manual for Courts-Martial, United States, 1951, and the line of cases concerned with that particular evidentiary problem. Cf. United States v Lake, 17 USCMA 3, 37 CMR 267. We determine this approach advisable, for in the words of United States v Rumely, 345 US 41, 48, 97 L ed 770, 73 S Ct 543 (1953), cited in United States v Culp, 14 USCMA 199, 201, 33 CMR 411:

" 'Grave constitutional questions are matters properly to be decided by this Court but only when they inescapably come before us for adjudication. Until then it is our duty to abstain from marking the boundaries of congressional power or delimiting the protection guaranteed by the First Amendment. Only by such self-restraint will we avoid the mischief which has followed occasional departures from the principles which we profess.' "

The decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered on the original charge or the board of review may reassess the sentence on the basis of a finding of guilty of the lesser included offense.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

An accused serving a sentence in a civilian jail is not in the same position as one who is arrested or otherwise deprived of his freedom of movement as a suspect or accused. The jail cell to the sentenced prisoner is his place of abode; it is his home. In my opinion, therefore, the atmosphere of restraint incident to his status, does not generate the same psychological pressure as custodial restraint incident to station house interrogation or street arrest. I agree with the determination by the Court of Appeals for the Fifth Circuit that an interview conducted with a person while he is "serving a state sentence cannot be properly viewed as subjecting him to the overbearing psychological pressures incident to the 'custodial interrogation' contemplated in Miranda." Mathis v United States, decided April 28, 1967, 35 U. S. Law Week 2644–2645. Since the conditions of implied coercion postulated in

Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602 (1966), are absent from the conditions of the accused's interrogation, the safeguards designed by *Miranda* to protect against the coercive pressures are inapplicable. See United States v Knight, 261 F Supp 843 (ED Pa) (1966). I am satisfied from this record of trial that the accused was appropriately advised of his right to remain silent and of his right to counsel and understood he had a free choice to remain silent or to speak. He elected voluntarily to speak. Kear v United States, 369 F2d 78, 83 (CA 9th Cir) (1966). I would sustain the law officer's ruling admitting the pretrial statements, and affirm the decision of the board of review.