UNITED STATES, Appellant

v

ROBERT L. SOLOMON, Lieutenant (junior grade),
U. S. Navy, Appellee

17 USCMA 262, 38 CMR 60

No. 20,204

November 9, 1967

*Commander Walter F. Brown,* USN, argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel C. R. Larouche,* USMC.

*Lieutenant Peter F. Vaira,* USNR, argued the cause for Appellee, Accused.

### Opinion of the Court

KILDAY, Judge:

Accused was arraigned before a general court-martial convened at the United States Naval Base, Norfolk, Virginia, charged with larceny of public funds, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He pleaded not guilty but was found guilty as charged and sentenced to be dismissed from the service, confinement at hard labor for eighteen months, and forfeiture of $300.00 per month for a like period. The convening authority approved the findings and

sentence. A Navy board of review held that continued questioning of the accused, by agents of the Office of Naval Intelligence, subsequent to his request for counsel and before counsel had been obtained, effectively denied the accused the opportunity to consult with counsel and rendered his pretrial statement inadmissible. Since consideration of the statement by members of the court was reversible error warranting a rehearing, the board of review set aside the findings of guilty and the sentence and declared that a rehearing may be ordered.

The Acting Judge Advocate General of the Navy, pursuant to Article 67 (b) (2), of the Code, 10 USC § 867, certified the decision of the board of review to this Court on the following issue:

"Was the board of review correct in holding that the admission into evidence of the extra-judicial confession of the accused constituted prejudicial error?"

A brief discussion of some of the evidence is necessary to place the certified question in proper perspective. A former supply officer aboard the U. S. S. RANDOLPH testified that on March 21, 1966, he conducted a surprise cash verification audit which revealed a shortage in excess of $6,000.00. The accused was interrogated by agents of the Office of Naval Intelligence on May 15, 1966. At the outset of the interview, ONI Agent R testified:

". . . the accused was advised of the provisions under Article 31, of the Uniform Code of Military Justice.

"Q. [TC]. Specifically?
"A. Specifically that he was being investigated concerning the shortage of funds of six thousand dollars aboard the USS RANDOLPH; and that he did not have to make any statement or answer any questions concerning this matter, and that any statements or answers that he did give could be used in evidence against him in a trial by court-martial.

"Q. Was anything said to you about his right to counsel?

"A. Yes, sir. He was advised that he could consult with counsel prior to taking the polygraph examination.

"Q. And now before the 15th had you interrogated Mr. Solomon?
"A. Yes, sir. I had seen him on the 11th and 13th.

"Q. Was he given a warning this time?
"A. Yes, sir; he was.

"Q. Was he advised of his right to counsel on the 11th and 13th?
"A. Yes, sir."

According to the witness, the interview began at about 9:00 a.m. At approximately 10:10 a.m., the accused stated that "he wanted to see counsel about another individual." Trial counsel then inquired:

"Q. Did he indicate that he wanted counsel for himself?
"A. At one point he did want to discuss the matter.

"Q. Who was present at the time Mr. Solomon asked he would like to discuss the matter with counsel?
"A. Mr. D . . . and myself.

"Q. What did Mr. D . . . do?
"A. Mr. D . . . left the room to arrange for counsel.

"Q. As you indicated here this was on a Sunday.
"A. Yes, sir.

"Q. What did you do when Mr. D . . . left the room?
"A. I engaged in a general conversation, not related to the subject with Mr. Solomon to a point where I asked when how deeply was he involved? He said, 'he was deeply involved.' I asked him to clarily it and—

"Q. He indicated that he stole the money?
"A. Yes, sir."

Attached to the record of trial (Appellate Exhibit 5) are two tape recordings of the above-mentioned interview. Government counsel have appended to their brief a verbatim transcript of the second of these tapes which, when played in an out-of-court hearing, was identified by Agent R as having started at approximately 10:15 a.m. after he

had administered a polygraph examination of the accused. The opening conversation reflects that those concerned had just taken a coffee break. The initial warning by Agent R is not a part of this transcript. There is, however, a reminder by Agent D to the accused that the warning still applied. "Under Article 31—you do not have to answer any further questions nor do you have to make any further statements." Following some questions by both agents as to the accused's knowledge of the loss, in which it is implied that the accused might be withholding information out of a "misguided sense of loyalty with an individual who is already in hack," the following is recorded on page four of the transcript:

"MR. SOLOMON: Could I talk to a legal counsel for about 10 minutes or something like that—just about ten minutes? Just anybody, not to represent me, but to ask a couple of questions that I don't know. If he is not available, I will sit here and think maybe 10 or 15 minutes.

"MR. D . . . : I don't know if anyone is readily available at the present time. Is there any of your legal staff aboard the ship that you can contact by phone?

"MR. SOLOMON: Well, there are the ordinary line officers, they don't know.

"MR. D . . . : Do you have Commander Driscoll's phone number?

"MR. R . . . : I think we could get it. He may be available, either him or Lieutenant [Duke]. If you want a lawyer.

"MR. D . . . : At this point, it is immaterial to you whether it's Lieutenant Jones at the Naval Station or Commander Smith upstairs.

"[Door opens and shuts] [Mr. D . . . leaves]."

Thereafter, as testified to by Agent R, the latter engaged the accused in general conversation and then when explaining that the room was soundproof, unexpectedly asked him, "What have you got yourself into Bob?" The accused, after expressing a desire not to involve others, admitted taking the money. Later (after having disclosed the manner of the theft, the disposition of much of the funds, and having agreed to prepare a written confession) when the accused was informed that Commander Driscoll was on his way he stated:

"Well, there's really not much. It might not be a bad idea for me to talk to him, of course."

At trial, defense counsel objected to the admission into evidence of the accused's pretrial confession on the ground that he,

". . . was not given his right to counsel when he requested counsel. In other words the interrogation continued after the time he requested counsel and as a result of that subsequent interrogation he made an incriminating statement. . . ."

The defense further argued that under this Court's decision in United States v Gunnels, 8 USCMA 130, 23 CMR 354, the continued interrogation of the accused while awaiting the arrival of counsel amounted to a denial of counsel and resulted in the statement being involuntary.

The prosecution countered by arguing that the accused did not desire counsel to represent him personally but was interested in talking with counsel only with regard to how it might affect another person; that he completely and voluntarily incriminated himself.

At the outset, we pause to point out that at the time the accused expressed a desire to speak with counsel, as quoted above, he did not at that time nor had he previously indicated that he was doing so for the purpose expressed by counsel; that is, to determine whether what he might say in reply to further questioning would affect another person. As we have noted, the agent's questions implied a belief that the accused was withholding information and Agent R so admitted in cross-examination. It remains, however, that the accused did not so condition his request. The prosecution's contention is apparently based on the

testimony of Agent R, when, in reply to defense counsel's inquiry as to what time the accused indicated that he might want counsel for somebody else, he stated:

"I can't recall exactly. When Commander Driscoll arrived we asked him if he wanted to see him, he said, 'no'. The reason he did want to see Commander Driscoll was because he didn't want to involve the other individual, Scott."

We agree with the board of review that the "continued questioning after the accused had requested counsel effectively denied the accused the opportunity to consult with counsel and rendered his statement inadmissible." At the time this case was tried, October 31, 1966, we had not yet rendered our opinion in United States v Tempia, 16 USCMA 629, 37 CMR 249 (April 25, 1967). But the basis for the holding in the cited case, Miranda v Arizona, 384 US 436, 16 L ed 2d 694, 86 S Ct 1602, decided June 13, 1966, was, as noted in *Tempia*, applicable in this case. See also Johnson v New Jersey, 384 US 719, 16 L ed 2d 882, 86 S Ct 1772 (1966). A reading of *Tempia* will at once reflect that even the warning in the case at bar was fatally defective when tested by the principles set forth therein. See also United States v McCauley, 17 USCMA 81, 37 CMR 345; United States v Hardy, 17 USCMA 100, 37 CMR 364; United States v Pearson, 17 USCMA 204, 37 CMR 468. The decision of the board of review, however, was not based on *Tempia* but rather on Miranda v Arizona, supra, and United States v Slaughter, 366 F2d 833 (CA 4th Cir) (1966), as well as on United States v Brown, 13 USCMA 14, 32 CMR 14, and United States v Houston, 15 USCMA 239, 35 CMR 211.[1] The essential difficulty as found by the board is best expressed by the following quotation from our opinion in United States v Houston, supra:

". . . as we have pointed out

on many occasions, if an accused during the investigative process requests an opportunity to consult with counsel and is denied such, statements thereafter obtained from him in the investigation are inadmissible in evidence. United States v Gunnels, 8 USCMA 130, 23 CMR 354; United States v Rose, 8 USCMA 441, 24 CMR 251; United States v Wheaton, 9 USCMA 257, 26 CMR 37. As we declared in United States v Brown, 13 USCMA 14, 32 CMR 14, at page 17:

'The law is clear under the cases previously cited that when an accused or suspect requests such information it is error to misadvise him of his right to consult with an attorney and "force him to submit to questioning . . . without a lawyer." *Gunnels,* supra, at page 135. If the accused seeks to exercise his right to consult with counsel during interrogation he must be afforded the opportunity to do so.'

To the same effect, see Escobedo v State of Illinois, 378 US 478, 12 L ed 2d 977, 84 S Ct 1758 (1964)." [*Ibid.,* at page 245.]

It is clear from the transcript of the tape recorded interview that the accused requested counsel before he made *any* incriminating statements to the ONI agent; that following his request for counsel and while arrangements were being made to procure counsel and before the latter's arrival, the agent continued his interrogation of the accused and secured an admission of guilt. The accused's change of mind with reference to his desire for counsel came only after the confession had been made. In such circumstances, it can hardly be gainsaid that the accused was denied the assistance of counsel under the decisions of this Court prior to *Tempia.*

While it might be argued that the

---

[1] The board of review decision was dated three days after *Tempia* and had undoubtedly been prepared prior thereto. One board of review member, in a separate opinion, stated that prior to *Tempia* he believed the accused's constitutional rights had not been violated; however, since *Tempia* applied the holding in *Miranda* to military personnel after June 14, 1966, he concurred in the result.

accused, by submitting to continued interrogation while awaiting the arrival of counsel, waived his right thereto, the burden is on the Government to show such waiver, for in the words of *Miranda,* supra,

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." [384 US, at page 475.]

See also *Tempia,* at page 638.

Assuming *arguendo,* as the Government contended at trial and before this Court, that the accused desired to consult with counsel solely to determine another's criminal liability, the mere disclosure of the identity of such a potential witness against him is incriminating *per se* and thus a matter concerning which he has the right to consult counsel. Miranda v Arizona, supra.

A serious question remains, as observed by the board of review, and that concerns the testimony of MA2 Scott, who testified under a grant of immunity relative to his knowledge of the charged offense and who, on the day the accused was interrogated, turned over to ONI agents a package of money, which he was holding for the accused. Agent R admitted that the first indication he had that Scott was involved was obtained from his interrogation of the accused. According to the transcript this disclosure was made a considerable time after the accused acknowledged his guilt. If the testimony of Scott and his action in turning over the money was a product of the illegal questioning of the accused, the issue is squarely presented as to whether this evidence is competent. Unfortunately, the evidence is not clear on this question and resolution thereof must be left to a rehearing in the event such is held. Cf. United States v Workman, 15 USCMA 228, 35 CMR 200; United States v Haynes, 9 USCMA 792, 27 CMR 60; Wong Sun v United States, 371 US 471, 9 L ed 2d 441, 83 S Ct 407 (1963); Miranda v Arizona, supra.

The certified question is answered in the affirmative. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.