UNITED STATES, Appellee

v

JEFFEREY CAIOLA, Private, U. S. Army, Appellant

18 USCMA 336, 40 CMR 48

No. 21,430

May 23, 1969

*Captain Carmen P. Belefonte* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker, Captain Stephen Arinson,* and *Captain Anthony F. Cilluffo.*

*Captain Warren W. Kaufman* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick, Major Edwin P. Wasinger,* and *Captain Joel P. Schiff.*

Opinion

DARDEN, Judge:

Following his plea of guilty, the appellant was found guilty by a general court-martial at Fort Lewis, Washington, of both forgery and larceny—six counts of the former, five of the latter—in violation of Articles 123 and 121, Uniform Code of Military Justice, 10 USC §§ 923 and 921, respectively. The court imposed a sentence of dishonorable discharge, total forfeitures, and confinement at hard labor for eight years. The period of confinement was then reduced by the convening authority to three years and by the board of review to eighteen months. The issue presented by this appeal is:

"WHETHER PREJUDICIAL ERROR WAS COMMITTED AGAINST APPELLANT WHEN TRIAL COUNSEL WAS PERMITTED TO IMPEACH HIM ON CROSS-EXAMINATION BY THE USE OF A PRETRIAL STATEMENT FOR WHICH NO SHOWING HAD BEEN MADE OF COMPLIANCE WITH TEMPIA."

The record of trial shows that after findings, the accused testified in mitigation that he desired to remain in the service. Subsequent cross-examination by trial counsel included the following exchange:

"TC Isn't it a fact that while confined at the post stockade after the 29th of August, you had to fill out a questionnaire at the post stockade?

"A Yes, sir.

"Q Isn't it also a fact that in answer to the question on this form, 'Do you wish to return to duty to complete your military obligation?', your answer was 'No.'?

"A Sir, at that time I had just entered the stockade. I didn't know what was going on, why it was going on. I was upset. I was scared. The guards, as a new confinee, were testing me to see if I would take a swing at one of them. Now after three, almost three and a half months, I have done a lot of thinking. I know I have done wrong. I will take whatever punishment they give

me, if it is three years, if it is thirty years, but all I ask is, send me back to duty."

Appellate defense counsel insist that before a pretrial statement can be used, the Government must establish compliance with the warning requirements set forth in United States v Tempia, 16 USCMA 629, 37 CMR 249, "notwithstanding the absence of an objection by defense counsel." United States v Lincoln, 17 USCMA 330, 38 CMR 128. The pretrial statement of this appellant is said to be the product of a "custodial interrogation," for when it was taken, Caiola was held in the stockade and when questioned by stockade personnel responded with an admission against interest. For subsequent use of the statement in "an integral part of the military trial" the application of constitutional safeguards was necessary.

They argue that incriminating statements within the meaning of *Tempia* include testimonial evidence not necessarily probative of the unlawful conduct alleged. Why this statement was elicited is arguable, say the defense, but they maintain that purpose becomes immaterial where the answers gained damage the accused at trial. And, because military trials allow the jury to impose punishment, it is an integral part of the court-martial to which the rationale of *Tempia* should apply. Thus, trial counsel must show on the record full compliance with Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966), and United States v Tempia, supra, requirements. The argument continues that if the Court permits the practice of allowing stockade personnel to compile information usable later at courts-martial, a defendant will be discouraged from testifying, contrary to his "right to speak before sentence is imposed upon him." The evidentiary value of such evidence is insufficient to justify such a restriction.

Appellate Government counsel agree that the provisions of Article 31, Code, supra, 10 USC § 831, and the Fifth

Amendment apply to situations wherein a suspect is questioned regarding criminal endeavors. They acknowledge that accused was obviously a suspect, being in pretrial confinement. On the other hand, appellate Government counsel note that the question related to duty status, was foreign to any suspected offense, and was asked not in furtherance of an investigation. Accordingly, in appellate Government counsel's view there was no requirement that Caiola be advised of his right to remain silent or to obtain counsel. The argument also suggests that in this setting such demands could never be fully met, for the questioner has neither knowledge nor suspicion of an offense, and hence he could not possibly provide the required preliminary advice.

Appellate Government counsel stress that *Miranda* is intended to discourage illegal police activities. There is no reason to apply *Miranda* in this case, absent a wrong that needs to be rectified. Prison officials cannot preface every conversation with Article 31 warnings. This would be an extension of *Miranda* that would provide immunity for anything a prisoner might utter. Counsel for the Government add that here a duty to warn was nonexistent, for Caiola's statement was not incriminating. They contend that not all statements taken without proper warning are proscribed. Other Federal courts adopt this view. Cf. Martin v United States, 400 F2d 149, 153 (CA 9th Cir) (1968).

The Government urges that the law officer correctly allowed impeachment of Caiola on a matter unconcerned with the merits of the case.

I accept, for the purpose of this opinion, appellant's contention that the record of trial satisfactorily reflects a confrontation between the accused and military authorities that has all the ingredients of a "custodial interrogation," within the meaning of that term as used in *Miranda.* Thus, there is no need to identify and measure precisely the components that constitute such a situation. Furthermore, there is no reason for a prolonged consideration

of either the character of the appellant's pretrial responses or their relationship to the offenses charged.

To bring the present issue to a proper focus, however. it is appropriate to note again that military jurisprudence exists and develops separate and apart from "the ordinary Federal and State judicial systems in this country," even though their responsibilities may at times be parallel. United States v Tempia, supra, at page 633. Thus, in the civilian sphere, punishment is fixed by the trial judge, in the absence of a statute either permitting or requiring the jury to fix punishment. 53 Am Jur, Trial, § 288, and citations thereto. "Unless otherwise provided by statute, it is the duty of the court to impose sentence, or make such other disposition of the case as required by law, after the facts have been decided by the jury." Pope v United States, 298 F2d 507, 508 (CA 5th Cir) (1962).

In contrast, a court-martial is a two-step proceeding with a "dichotomy of purpose"; the second part, whÍch occurs after findings of guilty, is concerned solely with the gathering and proffering of evidence intended to favorably impress the court members in their assessment of an appropriate punishment. In United States v Stivers, 12 USCMA 315, 317, 30 CMR 315, the Court said:

"The Manual for Courts-Martial, United States, 1951, expressly recognizes the vast difference between the proceedings regarding the merits of the case and those relating to sentence. Thus, with respect to the latter, it provides for relaxation of the rules of evidence and permits affidavits, certificates, and other writings of apparent reliability to be received on behalf of the accused. Manual, supra, paragraph 75c(1). It unequivocally declares that the purpose of these proceedings is to enable the prosecution and the defense to present 'appropriate matter to aid the court in determining the kind and amount of punishment to be imposed.' Manual, supra, paragraph 75a. Recognizing this purpose and apparently in order to en-

courage an accused to present such information, personally or otherwise, it also provides that:

'Matter which is presented to the court after findings of guilty have been announced *may not be considered as evidence against the accused in determining the legal sufficiency of such findings of guilty upon review.*' (Manual, supra, paragraph 75a.) (Emphasis supplied.)" [See also United States v Blau, 5 USCMA 232, 17 CMR 232; United States v Plante, 13 USCMA 266, 32 CMR 266.]

Prosecution's introduction of Caiola's pretrial declarations must, therefore, be considered in the light of these distinctions.

*Tempia*, however, settled that an accused member of the armed forces is afforded protection under the Fifth Amendment to the Constitution. Moreover, the Court has reinforced that decision with a series of similar holdings. Cf. United States v Hardy, 17 USCMA 100, 37 CMR 364; United States v McCauley, 17 USCMA 81, 37 CMR 345; United States v Pearson, 17 USCMA 204, 37 CMR 468; United States v Wolf, 17 USCMA 253, 38 CMR 51; United States v Bollons, 17 USCMA 253, 38 CMR 51; United States v Solomon, 17 USCMA 262, 38 CMR 60. These cases have afforded protection to the accused whether the objective of the statements used was to show guilt or to attack credibility in regard to the merits. Cf. United States v Lincoln, 17 USCMA 330, 38 CMR 128.

The application of both statutory and constitutional restrictions is subject to interpretation. With regard to Article 31, this Court has said, for example, that if an accused "volunteers" incriminating information to authorities, he does so at his own peril. United States v O'Brien, 3 USCMA 325, 12 CMR 81; United States v Hinkson, 17 USCMA 126, 37 CMR 390. Moreover, civilian investigators are not bound by Article 31 requirements when acting independently of the military. United States v Penn, 18 USCMA 194, 39 CMR 194; United States v D'Arco, 16 USCMA 213, 36 CMR 369. Examining physicians are not within Article 31 requirements under some circumstances. United States v Malumphy, 12 USCMA 639, 31 CMR 225; United States v Baker, 11 USCMA 313, 29 CMR 129; United States v Babbidge, 18 USCMA 327, 40 CMR 39. Similarly, need of such a warning may depend upon the "officiality" which surrounds both the inquiry and the inquirer. United States v Cross, 17 USCMA 660, 34 CMR 440; United States v Ballard, 17 USCMA 96, 37 CMR 360.

The Supreme Court in Gilbert v California, 388 US 263, 18 L Ed 2d 1178, 87 S Ct 1951 (1967), placed handwriting exemplars outside the protection afforded by the Fifth and Sixth Amendments. The zone of a person's privacy is also opened to continual evaluation. Cf. Schmerber v California, 384 US 757, 16 L Ed 2d 908, 86 S Ct 1826 (1966), and the accompanying annotation in 16 L Ed 2d 1332. A "search" within the meaning of the Fourth Amendment is also an undefined and unsettled issue. Cf. Terry v Ohio, 392 US 1, 20 L Ed 2d 889, 88 S Ct 1868 (1968).

The question remains whether the privilege against self-incrimination demands exclusion of a pretrial statement, not used on the merits in any way, from being used during the sentencing proceedings to offset affirmative evidence intended to mitigate punishment of the accused.

Walder v United States, 347 US 62, 98 L Ed 503, 74 S Ct 354 (1954), is authority that illegally obtained evidence relevant to guilt or innocence of an accused may nevertheless be used at trial if restricted to the impeachment of accused's credibility regarding matter he had affirmatively introduced that goes beyond denial of the commission of the offense. Since *Miranda,* the efficacy of *Walder* in the usual trial proceeding has been placed in doubt. Cf. Groshart v United States, 392 F2d 172 (CA 9th Cir) (1968). Because on this occasion we are concerned with post-finding proceedings, however, I am constrained to hold that under the circumstances of this case, *Walder* has

sufficient vitality to permit the use of Caiola's statement. Consequently, on this basis, the law officer correctly permitted the use of Caiola's statement to be used in the post-finding proceeding for purposes of impeachment. Cf. Serrano v State, — Nev —, 447 P2d 497 (1968); People v Harris, — App Div 2d —, 298 NYS2d 245 (1969).

The decision of the board of review is affirmed.

QUINN, Chief Judge (concurring in the result):

No objection was made by the defense to trial counsel's use of the accused's pretrial statement. The statement is not a confession as to any offense and consequently there was, in my opinion, no need on the part of the Government to demonstrate that it was obtained after preliminary advice to the accused regarding his right to remain silent or under circumstances in which such advice was unnecessary. See my dissent in United States v Lincoln, 17 USCMA 330, 38 CMR 128. On this basis, I join in the affirmance of the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

By the simple expedient of not just relaxing but, in reality, suspending the rules of evidence, simply because the testimony occurred during the sentencing portion of this court-martial, *vis-a-vis* the hearing on the merits, the author Judge finds no error in the impeachment of the accused by use of a pretrial inculpatory statement for which the record contains no evidence of a prior warning under Article 31, Uniform Code of Military Justice, 10 USC § 831, and Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966). See also United States v Tempia, 16 USCMA 629, 37 CMR 249, and United States v Lincoln, 17 USCMA 330, 38 CMR 128. While the rules of evidence are indeed *relaxed* during that portion of the trial which deals only with the sentence (Manual for Courts-Martial, United States, 1951, paragraph 75c; United States v Strand, 6 USCMA 297, 20 CMR 13;

United States v Stivers, 12 USCMA 315, 30 CMR 315; United States v Manos, 17 USCMA 10, 37 CMR 274), they are not abolished, since it is still a part of the trial procedure (United States v Strand, supra), and the ordinary rules of evidence generally apply, as in the hearing on the merits. United States v Manos, supra; United States v Robbins, 16 USCMA 474, 37 CMR 94; United States v Grant, 11 USCMA 728, 29 CMR 544; United States v McDowell, 13 USCMA 129, 32 CMR 129; United States v Anderson, 8 USCMA 603, 25 CMR 107. The extent to which the rules are relaxed rests within the sound discretion of the law officer (United States v Strand, supra; United States v Franchia, 13 USCMA 315, 32 CMR 315), but we have not hesitated to reverse where plain error was present. United States v Stivers; United States v Robbins; United States v Grant; United States v McDowell; and United States v Anderson, all supra.

United States v Grant, supra, is particularly applicable to my view. In *Grant*, trial counsel, during the sentence proceedings, attempted to impeach a defense character witness by cross-examining him relative to prior nonjudicial punishments he had received. We held that since these offenses did not involve moral turpitude or otherwise affect the credibility of the witness (United States v Gibson, 5 USCMA 699, 18 CMR 323), they were improper matter for impeachment purposes. A majority of this Court found that prejudice was manifest and summarily reversed the conviction without hearing arguments of counsel. The dissenting member, while agreeing that the matter was improper for impeachment, would have affirmed on the ground that the testimony was only as to accused's character and related only to sentence, "during which proceedings the rules are considerably relaxed."

In United States v Anderson, supra, we reversed where, in his argument on sentence, trial counsel went outside the evidence of record, although the matter contained in his statement could properly have been brought to the

court's attention by merely calling witnesses to testify.

In United States v McDowell, supra, we held it was error for trial counsel to offer, during the presentence proceedings, evidence of nonjudicial punishment of the accused and a letter from the latter's division officer, as matter in aggravation. Although the offer was not accepted, we reversed because it was clear that the members of the court were aware of the essence of this inadmissible evidence.

Paragraph 75c, Manual, supra, provides:

". . . With respect to matter in extenuation and mitigation *offered by the defense,* the court may relax the rules of evidence to the extent of receiving affidavits, certificates of military and civil officers, and other writings of similar apparent authenticity and reliability." [Emphasis supplied.]

I am unaware of any similar provision of the Manual relaxing the rules of evidence with regard to matter presented by the prosecution. Cf. paragraphs 75b and 75d, Manual, supra.

The author Judge cites Walder v United States, 347 US 62, 98 L Ed 503, 74 S Ct 354 (1954), as authority for the proposition that illegally obtained evidence relevant to guilt or innocence of an accused may nevertheless be used at trial if restricted to the impeachment of accused's credibility regarding matter he had affirmatively introduced that goes beyond denial of commission of the offense. While acknowledging that since *Miranda,* the efficacy of *Walder,* in the usual trial proceeding, has been placed in doubt (Groshart v United States, 392 F2d 172 (CA 9th Cir) (1968)), he holds it has retained sufficient vitality because we are concerned not with a hearing on the merits but with post-finding proceedings. I do not believe this position is sustainable and the author Judge cites no authority beyond a simple relaxation of the rules of evidence (United States v Stivers, supra), and a Supreme Court holding, *Walder,* which, incidentally, involved a hearing on the issue of guilt or innocence.

*Walder* was decided on a very narrow point of law. That accused was indicted for four illicit transactions in narcotics. On direct examination he answered in the negative when asked by his counsel whether he had ever sold, possessed, or handled narcotics in any manner whatsoever. On cross-examination, in response to a question by Government counsel making reference to this direct testimony, Walder reiterated his assertion that he had never purchased, sold, or possessed any narcotics. The Government then presented evidence that at a previous time, one grain of heroin had been taken from him by a Government agent. The trial for that offense had been dismissed following a successful claim that the evidence had been obtained by an unlawful search and seizure. The trial judge admitted this evidence, but carefully charged the jury that it was not to be used to determine whether the defendant had committed the crime charged, but solely for the purpose of impeaching his credibility. When counsel objected to this evidence, the trial judge, as noted in the opinion of the Court of Appeals, 8th Circuit, stated:

". . . 'If you hadn't * * * asked him whether or not he had ever had anything to do with narcotics or any connection with them, then the court would have been compelled under the law to sustain the objection * * * But you opened it up by asking whether or not he had ever had anything to do with narcotics and as a result of that answer "No", then * * * it becomes competent to show that he did have something to do, that he did possess narcotics. I think you could show a prior sale of narcotics in order to impeach him as to that particular statement. It goes to his credibility * * * . The court will say to the jury that this testimony is not admitted for the purpose of showing the guilt of the defendant with respect to these particular sales * * * it is simply by way of impeachment as to the credibility of the witness.' The court so in-

**341**

structed the jury at the time the evidence was admitted and again in his final instructions." [Walder v United States, 201 F2d 715 (CA 8th Cir) (1953).]

In finding no error in this regard, the Court of Appeals, in a divided opinion stated:

". . . In the present case the evidence was introduced for the sole purpose of impeaching the credibility of the appellant, and the court was meticulous in protecting his rights by instructions limiting the consideration of the evidence to the one point for which it was admitted." [*Ibid.*, at page 717.]

In its consideration of the case, the Supreme Court stated:

". . . The question which divided that court, and the sole issue here, is whether the defendant's assertion on direct examination that he had never possessed any narcotics opened the door, solely for the purpose of attacking the defendant's credibility, to evidence of the heroin unlawfully seized in connection with the earlier proceeding. Because this question presents a novel aspect of the scope of the doctrine of Weeks v United States, 232 US 383, 58 L Ed 652, 34 S Ct 341, LRA1915B 834, Ann Cas 1915C 1177, we granted certiorari. 345 US 992, 97 L Ed 1399, 73 S Ct 1144.

"The Government cannot violate the Fourth Amendment—in the only way in which the Government can do anything, namely through its agents—and use the fruits of such unlawful conduct to secure a conviction. Weeks v United States (US) supra. Nor can the Government make indirect use of such evidence for its case, Silverthorne Lumber Co. v United States, 251 US 385, 64 L Ed 319, 40 S Ct 182, 24 ALR 1426, or support a conviction on evidence obtained through leads from the unlawfully obtained evidence, cf. Nardone v United States, 308 US 338, 84 L Ed 307, 60 S Ct 266. All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men.

"It is one thing to say that the government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment.

"Take the present situation. Of his own accord, the defendant went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics. Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.

"The situation here involved is to be sharply contrasted with that presented by Agnello v United States, 269 US 20, 70 L Ed 145, 46 S Ct 4, 51 ALR 409. There the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examination by asking the accused the broad question 'Did you ever see narcotics before?' After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant. In holding that the Government could no

more work in this evidence on cross-examination than it could in its case in chief, the Court foreshadowed, perhaps unwittingly, the result we reach today:

" 'And the contention that the evidence of the search and seizure was admissible in rebuttal is without merit. In his direct examination, Agnello was not asked and did not testify concerning the can of cocaine. In cross-examination, in answer to a question permitted over his objection, he said he had never seen it. He did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search. . . .' 269 US, at 35."

It is at once apparent that the direct testimony of Walder that he had *never dealt in nor possessed any narcotics,* unlike that of Agnello, who was not asked on direct examination whether he had ever seen the particular can of cocaine which had been taken from his house during an illegal search, was the basis for the Supreme Court's differentiating the two cases and holding that in *Walder* the door was open for proper impeachment, but for impeachment only. In such a case, it is obvious that an appropriate cautionary instruction on the use of this evidence is, as noted above, a necessary concomitant to its introduction.

In the case at bar, the accused, on direct examination, when asked by his counsel whether he wanted to stay in the service, replied: "Most definitely, sir." His further testimony related to why he desired to remain in the service, his duties in the stockade, and his position as a parolee there, and the fact that he had, in writing, volunteered for duty in Vietnam. On cross-examination, trial counsel asked several questions relative to accused's testimony that he wanted to stay in the service:

"Q You have stated you want to stay in the Army, did you want to stay in the Army then [at the time of a previous absence without leave] ?
"A Yes, I do, sir. . . .

.   .   .   .   .

"Q But you say you want to stay in the Army, that this has no bearing whatsoever on your feeling toward the Army, these two AWOL'S?
"A No, sir.

.   .   .   .   .

"Q You said that, again, you have always wanted to stay in the Army?
"A Yes, sir, I had planned on going a long way in the Army.

"Q Isn't it a fact that you filled out a certain questionnaire when you were a prisoner at the stockade—"

At this point, the law officer called for a side bar conference during which he expressed concern over whether an incriminatory statement was going to be introduced and whether any advice had been given as to the accused's rights prior to filling out the questionnaire. When assured by trial counsel that he only desired to impeach the accused by use of a reply on the questionnaire that signified he was not interested in remaining in the Army, the law officer allowed him to continue for that purpose.[1] The colloquy continued:

"TC Isn't it a fact that while confined at the post stockade after the 29th of August, you had to fill out a questionnaire at the post stockade?
"A Yes, sir.

"Q Isn't it also a fact that in answer to the question on this form, 'Do you wish to return to duty to complete your military obligation?', your answer was 'No.'?
"A Sir, at that time I had just entered the stockade. I didn't know what was going on, why it was going on. I was upset. I was scared. The guards, as a new confinee, were testing me to see if I would take a swing at one of them. Now after three, almost three and a half months, I have done a lot of thinking. I know I have done wrong. I will take whatever punishment they give me, if it is three years, if it is

---

[1] The law officer failed to instruct the court on the use it could make of this evidence. Walder v United States, 347 US 62, 98 L Ed 503, 74 S Ct 54 (1954).

thirty years, but all I ask is, send me back to duty."

It is clear that the accused, in his direct testimony confined himself to a declaration as to his *current* desire to remain in the service. He did not, thereby, open the door to being impeached by a showing, through the use of otherwise inadmissible evidence, that at some other time he may have had or had expressed a different view. In the words of Agnello v United States, 269 US 20, 35, 70 L Ed 145, 46 S Ct 4 (1925), "He did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained" through use of the unwarned questionnaire.

What is proscribed in *Walder* is the freedom to "resort to perjurious testimony" on the assumption that prior inconsistent statements would be kept from the jury. See Tate v United States, 283 F2d 377 (CA DC Cir) (1960). But preciseness with regard to the alleged perjured statement is of the essence of that offense. Strictness of proof is required. United States v Purgess, 13 USCMA 565, 33 CMR 97; United States v Dotson, 17 USCMA 352, 38 CMR 150. In such circumstances, since I find no inconsistency between accused's testimony that he, *at that time,* desired to remain in the service and a prior statement that, *at the previous time,* he was of a different mind, I believe *Walder* to be inapposite.

But even were I to assume, for the sake of argument, that *Walder* applied in these circumstances, I could not agree with the author Judge's view that it has retained sufficient vitality to be useful, in view of the Supreme Court's subsequent decision in Miranda v Arizona, supra.

The precise question was before the court in Groshart v United States, supra. Groshart was convicted of smuggling and concealing marihuana, amphetamines and barbiturates from Mexico to the United States. In a pretrial interview by Customs' Agents, Groshart told the agents that one "John" had asked him to drive a sta-

tion wagon to Mexico for the purpose of picking up marihuana; that he met "John" the next day, received the station wagon, and drove it to a park in Tijuana where he left it for about four hours. At trial, Groshart testified that he obtained the wagon through a friend named Long; that Long had borrowed the car from someone else; that this was the vehicle in which the contraband was found; and that he (Groshart) had parked the car in Tijuana for ten hours and had not known of the presence of the contraband until the vehicle was inspected on his return.

The District Court ruled that Groshart's statement could not be fully admitted into evidence, since it was apparent that it was obtained in violation of Miranda v Arizona, supra. However, the judge ruled that certain portions were admissible as evidence to impeach Groshart's testimony. In view of this ruling, Groshart admitted during cross-examination that he had stated during the pretrial interrogation that one "John" had contacted him and asked him to drive his station wagon to Mexico. The Customs' Agent then testified that Groshart had also stated he had in fact received the car from "John" and had left it parked in Tijuana for about four hours. All references to the purpose of the trip were omitted and the District Court instructed that evidence of the earlier, inconsistent statements was admitted only for impeachment purposes.

The Court of Appeals agreed with the District Court's holding that Groshart's statement was obtained in violation of the standards of *Miranda*. It then observed that the correctness of the District Court's ruling that certain parts of the statement could be admitted for the sole purpose of impeachment, "is the crucial issue before us. See generally Kent, Miranda v Arizona—The Use of Inadmissible Evidence for Impeachment Purposes, 18 W. Res. L. Rev. 1177 (1967); Comment, The Impeachment Exception to the Exclusionary Rules, 34 U. Chi. L. Rev. 939 (1967)." Noting that the District Court judge's ruling was

based on Walder v United States, supra, the court discussed several decisions in which the *Walder* doctrine was variously applied or distinguished,[2] and then said, at page 177:

"These decisions of the District of Columbia Circuit were issued prior to the Supreme Court's far-reaching decision in Miranda v State of Arizona, supra. Writing for the majority of the Court in *Miranda*, Chief Justice Warren stated as follows:

'The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of *any statement* made by the defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. *In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.'*

384 US at 476–477, 86 S Ct at 1629 (emphasis added). Furthermore,

the Court also explained that 'unless and until such warnings and waiver are demonstrated by the prosecution at trial, *no evidence obtained as a result of interrogation can be used against him.'* 384 US at 479, 86 S Ct at 1630 (emphasis added).

"The prosecution contends that in *Miranda* the Supreme Court did not intend to forbid use by the prosecution of illegally obtained evidence under all circumstances. While this interpretation of the Court's language may be possible, we cannot accept it as correct. It would be a strained interpretation, an interpretation inconsistent with the Chief Justice's direct reference to the former use of such statements 'to impeach' and with his immediately following injunction: 'These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver, required for any other statement.' 384 US at 477, 86 S Ct at 1629.

"Accordingly, we hold that if statements are obtained from a defendant in violation of the *Miranda* rules and if the interrogation relates to an offense for which the defendant is ultimately brought to trial, those statements, as well as any portions thereof, may not be used against the defendant at the trial for any purpose whatsoever. Whether the objective be to show guilt or to attack credibility, at the trial the prosecution must first show that the statements have been obtained in compliance with constitutional requirements as defined by our highest court. Insofar as *Walder* would compel a different result, it has, we believe, been undermined by the Supreme Court's *Miranda* decision.

"We are not alone in reaching this result. The Tenth Circuit has recently held as follows:

'While it is true that the court

---

[2] Tate v United States, 283 F 2d 377 (CA DC Cir) (1960); Johnson v United States, 344 F 2d 163 (CA DC Cir) (1964); Bailey v United States, 328 F 2d 542 (CA DC Cir) (1964); White v United States, 349 F 2d 965 (CA DC Cir) (1965); Inge v United States, 356 F 2d 345 (CA DC Cir) (1966).

in Miranda was concerned with the admissibility of custodial statements as substantive proof of the facts related, we think the procedural safeguards prescribed there are equally important to a consideration of the admissibility of prior inconsistent statements for impeachment purposes. If the veracity of an accused person testifying in his own behalf is to be attacked by a prior inconsistent or contradictory statement made while he was under in custody interrogation, we think it is reasonable to require the Government to meet the burden of showing that the statement was voluntarily made after the accused had been fully advised of all of his rights and had effectively waived them in accordance with the standards prescribed by Miranda. To hold otherwise would permit an unconstitutional invasion of an individual's rights to be used as a weapon to influence the jury's consideration of his trial testimony.'

Wheeler v United States, 382 F2d 998, 1001 (10th Cir 1967); accord, Commonwealth v Padgett, 428 Pa 229, 237 A2d 209 (1968). Similarly, the Oregon Supreme Court has recently stated:

'We are also unable to follow the "middle ground" suggested in Tate v United States, supra, to the effect that if a defendant merely takes the stand and denies his part in the crime he may not be impeached by the fruits of unconstitutional interrogation, but if he testifies about collateral matters he may be so impeached. Such a rule would be virtually unworkable. The usual reason a defendant chooses to take the stand is to give the jury a comprehensive statement of his side of the story. Any story that would be responsive to the questions raised by the state's case would tend to open up collateral matters and would invite impeachment if the tools of impeachment were at hand. The state should be free to impeach, but it ought to come by its impeachment as legally as it accumulates its other evidence.'

State v Brewton, — Or —, —, 422 P2d 581, 583, cert denied, 387 US 943, 87 S Ct 2074, 18 L Ed 2d 1328 (1967). These very recent decisions are persuasive. They furnish strong support for our conclusion—a conclusion to which we are impelled not only by the force of Miranda, but also by other important and very powerful considerations.

"In the present situation the facts to which Groshart's impeachment pertained can be characterized as either direct or collateral. All of the facts related to 'lawful proper acts.' The length of time during which Groshart left the car parked in Tijuana would appear to be a 'minor point.' And it would seem that the manner in which he obtained the station wagon is collateral to the principal issues of the case. At the same time, however, these facts also appear to be directly related to the elements of Groshart's defense to the charges, a defense based on the contention that he never knew that the dangerous drugs were in the car or that they were to be placed there.

"As our holding indicates, we think that the distinctions between direct and collateral issues, between major and minor points, or between lawful and unlawful acts are essentially meaningless. We reject them because they are, as characterized by the Oregon Supreme Court, 'virtually unworkable.'

"The defendant's testimony will often involve a chain of intimately connected events. Separation of the specifics of his testimony into one group of direct issues and one group of collateral issues, or separation according to one of the other supposedly simple distinctions, would ordinarily be an extremely difficult, if not impossible, task. Furthermore, the court could not stop there, but would be required to take the additional step of separation of the il-

legally obtained statements between those parts that would be totally inadmissible and those parts that would be admissible for impeachment purposes. Even if these were the only difficulties which would attend adoption of the Government's position, it is better to eliminate them also and thereby avoid, to all possible extent, needless cluttering in a sensitive area of fundamental rights.

"The complications, however, would not stop there. Additional problems are seen when one considers the fact that the impeaching statements will generally, as was the case here, be presented to the jury out of the context in which they were made. When presented in the absence of the parts of the whole statement that surround or intersperse them, those parts admitted for impeachment purposes may take on a significantly different meaning or import than that which they may have originally had. Yet the defendant might not be able to rebut this altered meaning or import without himself introducing the otherwise inadmissible parts of the illegally obtained statements.

"The ability of the prosecution to use portions of the statements illegally obtained from the defendant for impeachment purposes may also force the defendant to forego his right to testify in his own behalf. Such testimony would rarely be effective unless it provided a comprehensive explanation of the defendant's version of his connection, if any, with the alleged crime; yet such an encompassing explanation would immediately open the way for use by the Government of isolated parts of the illegally obtained evidence to attack the defendant's credibility. Cf. Simmons v United States, 390 US 377, 19 L Ed 2d 1247, 88 S Ct 967 (1968).

"Surely, too, we should not encourage law enforcement officials to interrogate one in violation of his constitutional rights with the sole purpose of obtaining evidence for use in impeaching him should he testify at a future trial or for the purpose of thereby preventing a defendant from taking the stand in his own defense. Impeachment is often an extremely significant factor in close cases. There is little doubt but that the great majority of the law enforcement officers of our Circuit strive to comply with the mandates of the Constitution. At the same time, they are engaged in a continuing, frustrating battle against lawlessness. If authorized to do so, they could not fairly be criticized for conducting unconstitutional interrogations designed to elicit possible impeachment evidence. This would be particularly likely in cases where it seemed probable that a constitutional interrogation would provide little if any useful evidence. Indeed, a two-step interrogation process would probably evolve—the first step being an unconstitutional interrogation designed to obtain possibly valuable impeaching evidence and the second being an interrogation conducted in compliance with *Miranda* in the hope of obtaining directly admissible evidence. Thus, there is significant danger that acceptance of the Government's position would tend to frustrate and defeat the manifest objective sought by the Supreme Court in its *Miranda* opinion. Whatever may be one's individual evaluation of the exclusionary rule, it cannot be doubted that in this area the Supreme Court has established that it is necessary for the protection of the fundamental rights of all individuals. This being true, we will not attempt partially to open the door so clearly shut by the Supreme Court."

In United States v Birrell, 276 F Supp 798, 817 (SD NY)(1967), the court said:

"Because the precedential authority of *Walder* has been so seriously attenuated and because the trend of current constitutional developments points in another direction, this Court respectfully declines to follow *Walder*. The Government should be restricted to using untainted evidence

in the impeachment of witnesses just as it is similarly restricted in making out its direct case."

And in United States v Prebish, 290 F Supp 268, 275 (SD Fla) (1968), the following appears:

". . . After considering the facts of the instant case, and considering in which areas contradiction might develop at trial, I can only agree with the two courts listed above [Groshart v United States and State v Brewton, both supra] that the tests for applying *Walder* are simply unworkable. I believe that the history of the *Walder* principle with its proliferation of tests for applying the principle and the Courts' growing dissatisfaction with these tests simply reflects a growing realization that *Walder* was a bad decision. In short the reasons against *Walder* have finally come to outweigh the reasons in favor of it."

Similarly, Blair v United States, 401 F 2d 387, 392 (CA DC Cir) (1968), holds that:

". . . The teaching of *Walder*, however valid in other contexts, appears irrelevant when a *Miranda* problem is presented."

See also United States v Pinto, 394 F 2d 470 (CA 3d Cir) (1968), and People v Gardner, 71 West's Cal Rptr 568 (1968). Cf. Simmons v United States, 390 US 377, 19 L Ed 2d 1247, 88 S Ct 967 (1968).

As a final note, I believe that this opinion, *sub silentio,* overrules this Court's early holding in United States v Pedersen, 2 USCMA 263, 8 CMR 63, that statements obtained in violation of Article 31, Code, supra, may not be used to impeach an accused. Their use in that case was prejudicial error.

In sum then, I do not believe that the rules of evidence are so relaxed during the presentencing procedure, as to allow an accused to be impeached by an unwarned prior inconsistent statement taken by the Government while the accused was in custody. The statement in this case was given while the accused was in the stockade and the record contains no evidence that a prior warning was given. In my view, also, *Walder* is inapposite since there is no evidence that the accused's testimony was perjurious and perjury was of the essence in *Walder*. But assuming *arguendo* that the *rationale of Walder* is pertinent, that case dealt with evidence illegally seized by the Government while, in this case, we are concerned with an illegally obtained *statement,* which the Supreme Court, in Miranda v Arizona, supra, held may not be used for any purpose, specifically, impeachment.

Since I believe that the law officer erred to the substantial prejudice of the accused by permitting trial counsel to improperly impeach the accused, I would reverse the decision of the board of review and order a rehearing.