UNITED STATES, Appellee,

v.

David Wayne KESTELOOT, Torpedoman's Mate Seaman Apprentice,
U.S. Navy, Appellant.

No. 37,044.
NCM 78 0845.

United States Court of Military Appeals.

Jan. 21, 1980.

For Appellant: *Lieutenant David S. Durbin, JAGC, USNR.*

For Appellee: *Lieutenant J. G. Van Winkle, JAGC, USNR* (argued); *Commander T. C. Watson, Jr. JAGC, USN* (on brief); *Lieu-*

tenant Commander Paul B. Thompson, JAGC, USN.

## OPINION

COOK, Judge:

The accused was convicted of larceny and wrongful disposition of government property. On review, the Court of Military Review held that while an apartment shared by the accused had been subjected to an illegal search, certain crucial evidence was property admitted because it had not been obtained by exploitation of evidence discovered in the search. The accused supports the court's holding as to the illegality of the search, but challenges the determination that the evidence in issue, which includes a pretrial confession by him, is not subject to the exclusionary rule. We affirm that court's decision.

At about 7:30 on the morning of October 17, 1977, Petty Officer Cano, operator of the ship's store aboard the USS SAMUEL GOMPERS, discovered that the store had been broken into. An inventory check revealed that merchandise valued at approximately $2,500 had been taken, including 26 watches. Some days later, civilian police were advised that a Miss Yolanda Sandoval had sold to a pawn shop, for $25.00, a watch which still bore a price tag of $145.00. Detective Boyer of the San Diego Police Department went to the address shown as Miss Sandoval's in the report to inquire into the circumstances of the acquisition of the watch and its sale "for such a cheap price." The Court of Military Review found that Miss Sandoval did not consent to Boyer's entry into, and search of, the apartment. It also found that the accused shared the premises with Miss Sandoval and, therefore, could challenge the entry and search as

illegal. Evidence in the record supports the court's findings and its conclusion as to accused's standing to object to the search of the apartment.

Evidence obtained in an illegal search is subject to exclusion from trial as part of the government's direct case. Additionally, other evidence obtained through exploitation of illegally seized evidence is excludable. The accused contends that statements by Miss Sandoval and his own confession to a special agent of the Naval Investigative Service were directly derived from evidence discovered by Detective Boyer in his search of the apartment. As set out in accused's brief, "the defense position is that discovery of . . . [a] Sony TV carton bearing appellant's name [which had been mailed by Mr. and Mrs. Kesteloot from New Baltimore, Michigan, to the accused in California] was the link that guided law enforcement officials to . . . [accused's] identity" and to the interrogation of Miss Sandoval "as to his role" in the offenses charged.

The exclusionary rule has qualifications. Two are relevant here. Evidence obtained from a source independent of the illegally obtained evidence does not come within the rule; and evidence having only an attenuated connection with the illegal evidence is also not within the rule. Recently the United States Supreme Court posited standards for application of the attenuation qualification to live-witness testimony. *United States States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). I put aside consideration of the admissibility of Miss Sandoval's testimony and use of her pretrial statements[1] under

---

1. The substance of Miss Sandoval's pretrial statements to the civilian police is not separately identified in the record. However, the clear inference from her testimony, both as a defense and a government witness, and that of Detective Boyer, is that she informed the civilian police that, about the middle of October, the accused left the apartment "late at night" to go to his ship, "the Samuel Gompers." Later he returned, "woke . . . [her] up," and gave her a sea bag filled with watches, cameras, clock radios, lighters and cigarettes. He told her he had stolen them from the ship's store. Many of the articles were sold in a single transaction for $500.00 These were recovered, with the assistance of Miss Sandoval, and were later turned over to a naval investigator. Other articles were recovered from Miss Sandoval's friends and these were also delivered to a naval investigator.

the attenuation exception because I am satisfied that her disclosures resulted from questioning as to the watch she had pawned, a matter independent of the empty carton with the accused's name on it.[2] I conclude, therefore, that Miss Sandoval's statements to the civilian police were not derived by use of the tainted evidence of the Sony carton and that her testimony as a government witness at trial was properly admitted.

■ Turning to accused's confession and other evidence obtained in a consensual search of his wall locker, the evidence in my opinion amply supports a finding by the trial judge and the Court of Military Review that these did not result from the mailing inscriptions on the empty Sony carton. Special Agent Barrows testified he interviewed the accused after he received a report from the civilian police as to accused's implication in the ship's store break-in. After full advice as to the right to remain silent and the right to counsel at the interrogation, the accused refused counsel and elected to submit to questioning. At first, he denied any knowledge of "what . . . [Barrows was] talking about" when advised of the break-in and larceny. He was then informed Miss Sandoval had been "caught pawning one of the stolen articles and that she had copped out and told the police about his involvement." He

2. Although their testimony differs on a number of points, Detective Boyer and Miss Sandoval substantially agree on the events between the finding of the empty carton in a closet and the questioning of Miss Sandoval at the local police station that led to her disclosures implicating the accused. As Miss Sandoval's testimony is more expansive, we set out the pertinent parts:

Q [trial counsel]. When he [Detective Boyer] first came to the door, didn't he ask you about the watch?
A. Yes.
Q. And that's when he wanted to search?
A. No, he started looking at the stereos. That's when he wanted to search. . . .

Q. So he didn't talk about the watch any more at your apartment, did he?
A. No.
Q. But he did talk about the watch when you got back down to the Police Headquarters?
A. Yes.
Q. And he asked you about where you got the watch?
A. Yes.
Q. And why you pawned it for such a cheap price?
A. Yes.
Q. That's when you told him that Kesteloot had gotten it from the ship, is that right?
A. Yes.
Q. That's the first time you said anything about Kesteloot, right?
A. [No response.]
Q. Except that he was your boyfriend?
A. Yes.
Q. And it was in response only to that watch, correct?
A. Well, he talked more up there about David—at the Police Department.
Q. But at the apartment you didn't tell him anything about the ship?

A. No—yes, I told him David was in the Navy, but that was all.
Q. You didn't tell anything about—
A. No.
Q. —breaking into the Ship's Store?
Q. No.
Q. It was only when you got down to the Police Station that he asked you about the watch?
A. Yes.

On redirect examination:
Q [defense counsel]. In the apartment, did Detective Boyer say anything about any watches other than the one that he had with him?
A. No, he just talked about that watch.
Q. Were you ____
A. He asked me if there was any more and I said, "no".
Q. At what point did you ask that question?
A. As he was—he was—he looked behind the stereo and I had a bag and there were some watch cases so he knew there was more than one. He was asking for the other ones.
Q. Did you, during Detective Boyer's search of the apartment, tell him that David lived there also?
A. Yes.
Q. And at what point did you tell him that?
A. When he asked me who David was and then he asked me where he was at. I said that he was on the ship. He asked me, "Does he stay on the ship?" and I said, "No, he lives here with me."
Q. And when he asked you that was that near the time the time when he found the box—the empty boxes?
A. He found the box before. That's how come he ____
DC: Thank you.

was also shown a statement made by her. Then he became "cooperative." He made an oral statement of his complicity and followed that with a written, sworn confession. If there was any connection between the empty carton in the accused's apartment and the accused's confession and consent to search, I am impelled to conclude the connection was so attenuated as to free the confession and consent from the exclusionary rule.

The decision of the United States Navy Court of Military Review is affirmed.

Chief Judge FLETCHER concurs in the result.