**UNITED STATES**

v.

**Roger Charles LEIFFER, 559 98 8248,
Ship's Serviceman Seaman Recruit
(E–1), U. S. Navy.**

**NCM 79 0407.**

U. S. Navy Court of Military Review.

Sentence Adjudged 14 July 1978.

Decided 30 June 1980.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Defense Counsel.

CAPT Craig L. Kemmerer, USMCR, Appellate Government Counsel.

Before CEDARBURG, C. J., and FERRELL and DONOVAN, JJ.

DONOVAN, Judge:

Appellant was tried on a rehearing by a general court-martial consisting of officer members on 30 June, 5 through 7 and 10 through 14 July 1978. Contrary to pleas, appellant was found guilty of one specification of attempted robbery, two specifications of robbery, one specification of sodomy, two specifications of assault, and one specification of wrongful appropriation in violation of Articles 80, 122, 125 and 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 922, 925, 921. The sentence awarded was a bad-conduct discharge, confinement at hard labor for 12 months, and forfeiture of all pay and allowances. On 18 July 1978, the sentence to confinement at hard labor was deferred but the deferment was rescinded pursuant to appellant's request on 28 November 1978. On 26 February 1979, the officer exercising general court-martial jurisdiction approved the sentence as adjudged and later ordered that forfeitures in excess of two-thirds pay per month would not be applied during the remainder of the period for which forfeitures were adjudged.

Appellant has assigned the following as error:

THE MILITARY JUDGE IMPROPERLY FAILED TO SUPPRESS THE TESTIMONY OF [CO–ACTOR L] AS FRUIT OF THE POISONOUS TREE DESPITE HIS FACTUAL DETERMINATION THAT L's IDENTITY WAS DISCOVERED AS A RESULT OF INFORMATION ILLEGALLY OBTAINED BY THE GOVERNMENT.

Inasmuch as we find this assignment meritorious, we omit discussion of the four remaining assigned errors.

Appellant robbed Seaman Recruit G on board Naval Training Center (NTC), San Diego, California, near midnight on 16 August 1977. In this, and all other offenses of which he was found guilty, he was accompanied by another sailor, his co-actor, L. Victim G, angry and dismayed, followed his assailants and asked why they robbed him. Without comment, appellant stepped over to him and broke his jaw with a single punch.

Within the hour, appellant attempted to rob Seaman Recruit F, who managed to run away. Some half-hour later, appellant disarmed Seaman Recruit B, a roving patrol, of his duty nightstick by threatening possession of a gun, seized B and while holding him in fear, entered an NTC barracks and robbed Seaman Recruit E. Appellant and L fled unapprehended.

One week later, again at NTC, appellant and L departed the enlisted club at closing time having drunk beer and heard a band perform. They seized from Seaman Recruit

W, who had sat at their table and departed with them, most of his clothing and his wallet, all of which were deposited some distance away; he was told where he could find them. A conviction of wrongful appropriation, vice larceny, was properly charged and found. While undressed, victim W was forced by stranglehold to perform fellatio on appellant and, at appellant's command, on L. Again they escaped unapprehended.

The victims reported the offenses and the Naval Investigative Service (NIS) composed a wanted notice depicting appellant, described at trial as the leader of the two, via "Identakit" as a bearded, stocky, pot-bellied, 5'9" male who had worn a yellow T-shirt with a logo entitled "Led Zeppelin Concert"; the T-shirt was similar to one described by one 17 August victim as worn by the suspect. NIS agents "field-interrogated" various young men in the NTC vicinity the night of 23 August and, up until the night of 30 August, one NIS agent had interviewed 9 out of a total of 16 bearded males initially spotted as possible suspects. Among those "field-interrogated" on 23 August were appellant and L, who gave their names and the name of their ship to the NIS agent who recorded the information as he had during the course of similar inquiries of other sailors found at a bus stop after the assault on victim W.

Four NIS agents were maintaining surveillance for suspects in these offenses,[1] as the enlisted club was closing at 2300 on 30 August. Appellant was spotted and remarked upon as bearded; one NIS agent commented to his partner, however, that appellant looked too tall. For lack of any other suspects as the club crowd dispersed, appellant was approached. Since appellant was then found to be wearing a yellow T-shirt with the "Led Zeppelin Concert" logo embossed on it, the main, or action, NIS agent for these offenses was called over to join the agents who had accosted appellant; that agent testified as follows:

[A]nd I looked at it and it read, "Led Zeppelin in Concert." At that point, I asked Mr. Leiffer if he would accompany me back to the office, which I told him was only a couple of blocks away, so I could conduct a further interview. I didn't have any paper with me and I didn't really want to conduct an interview in the street with everyone else there, so we____

Q. How did he respond to that?

A. He was reluctant to go back with me at first. . . .

(R.139). The NIS agent testified that he did not, on the street, consider appellant a suspect because his hair was parted differently and he was taller than the suspect whom the victims described; that no conversation occurred during the ride to the NIS office; and, that appellant provided his full identification, date and place of birth and his duty station to the NIS in their interview room. Appellant was asked when he was last on board NTC; he replied that it was the last time that the band "Mad Dog" had played at the club, adding that the band was his favorite and, knowing some members, he always sat near the band. The agent further testified that he only then became suspicious, remembering that victim W had met his assailants next to the bandstand and that "Mad Dog" last played at NTC on 23 August, the date W was assaulted. The agent testified that he exited the interview room to obtain an "acknowledgement and waiver of rights form, and to come back in and give Mr. Leiffer his Article 31 Rights." (R.141). While out of the room, he encountered another agent to whom he stated who and what he was on to, whereupon this second agent connected Leiffer's name as one of two men he himself had "field-interviewed" at a bus stop the night W was victimized. Finding his old note, this agent provided the questioning agent with Leiffer's name, L's name and their common ship.

---

1. The record is not clear if all four were dedicated to this case or were also on the lookout for suspects in unrelated offenses. Judicial review of police conduct often erroneously assumes the former.

A search of appellant's shipboard belongings was thereafter authorized by the commanding officer's representative and items, similar to those described by victims, were seized. Appellant, having earlier denied any culpability, was escorted to the ship and was present during the search. L was eventually found and questioned by NIS; he initially denied any guilt. Later that morning, however, under further questioning, L made full inculpatory statements which also incriminated appellant. Appellant continued to deny guilt and asked to see L. After L told appellant he had confessed, appellant also confessed.

The action NIS agent assigned to night surveillance duty with an official automobile (in which appellant was placed for the trip to the NIS office) testified he had no "paper". We believe him, as he was under oath, but in evaluating his testimony, the benefit given to his credibility prompts criticism of the procedures which were used.

Appellant contends that a subterfuge was perpetrated: that NIS desired to unbalance an initially even encounter on an open street by moving appellant, already a suspect, into official surroundings where subtle pressures on him would develop.

The issue of appellant's status at the time he was escorted from the club area into the backseat of an NIS sedan for the ride to the NIS office was litigated at the original trial. At the rehearing, the military judge adopted his prior rulings as the law of the case on rehearing as it related to that status, as well as to other issues. Those determinations are binding on us, Article 51(b), UCMJ, 10 U.S.C. § 851(b); *United States v. Goard*, 13 U.S.C.M.A. 588, 33 C.M.R. 120 (1963); *United States v. DeLeon*, 5 U.S.C. M.A. 747, 19 C.M.R. 43 (1955); *United States v. Volante*, 4 U.S.C.M.A. 689, 16 C.M.R. 263 (1954), and we list them here:

IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN THE PROSECUTION AND THE DEFENSE WITH THE EXPRESS CONSENT OF THE ACCUSED, THAT THE FOLLOWING IS THE LAW OF THE CASE, BASED UPON THIS COURT'S RULINGS AT THE ACCUSED'S FIRST TRIAL:

1. On the evening of 30 August 1977 when Special Agent Lucas was called over to the vicinity of the accused and he observed him wearing the yellow "Led Zeppelin in Concert" T-shirt, the accused was a suspect within the meaning of Article 31, Uniform Code of Military Justice, and was entitled to be warned of his rights. All statements made by the accused between that time and the time of his first Article 31 Warning at the Naval Investigative Service Office are inadmissible by reason of his failure to be properly warned.

2. The warning given to the accused later that night was tainted by the prior illegally obtained statements and that the taint had not been overcome or removed.

3. The search for and seizure of certain items on board the MONTICELLO [...] are tainted by the prior illegal statements.

4. Considering the totality of the circumstances which had occurred since 2300, 30 August 1977, the responses of the accused to Special Agent Larabee when he read [L's] statement to the accused were not solely the product of [L's] statement but were partly induced by the previously illegally obtained statements and seized evidence, and were therefore tainted.

5. [L's] identity was discovered as a result of the information illegally obtained on the evening of 30 August 1977.

6. The statement of [victim W] relating to the sodomy charge was obtained through [L] whose name was discovered as a result of the information illegally obtained on the evening of 30 August. Appellate Exhibit VI–D.

The military judge ruled that, notwithstanding the foregoing, appellant was not under apprehension and did voluntarily accompany the agents to their office; he further ruled that victim W's previously unreported complaint of forcible sodomy, as opposed to W's promptly reported assault and wrongful appropriation, was also obtained

as the fruit of illegal official conduct. The judge then ruled, however, that in-court testimony of L and victim W would nevertheless not be precluded by these rulings. (R.229–30). The reasoning for this ruling is not set out; presumably the court perceived an independent, untainted basis on which their testimony could be founded.

The Court of Appeals for the District of Columbia Circuit recently addressed relevant issues in *United States v. Scios*, 590 F.2d 956 (D.C.Cir.1978) (en banc). That court explains that the exclusionary rule was established in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), to safeguard Fourth Amendment rights. The rule bars the introduction not only of evidence seized in violation of that amendment but further evidence obtained through the means of such seized evidence, that is, the fruit of the poisoned tree. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). An exception to the "tainted fruit" doctrine exists where the connection between the illegal seizure and acquisition of further evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *United States v. Scios, supra* at 960. This exception is similar to that existing for the admission of evidence which the Government acquires independently of the evidence illegally seized and for the exception which applies attenuation where a witness, found as the result of an illegal search, voluntarily decides to testify. *See Wong Sun v. United States, supra.*

What the NIS agents appear to have overlooked, however, is that Article 31(b), UCMJ, 10 U.S.C. § 831(b), accords military personnel suspected of an offense *greater* protection than is required by the United States Supreme Court decisions involving civilians accosted by police. The Court of Military Appeals has "pointed out that, in the context of military life, the Article [31] has wider application than the constitutional prohibition against self-in-crimination." *United States v. Holcomb*, 18 U.S.C.M.A. 202, 206, 39 C.M.R. 202, 206 (1969). *Accord, United States v. Dohle*, 1 M.J. 223, 225 (C.M.A.1975). Mere suspicion, *whether or not followed by "custodial interrogation"*, requires an explanation of the Article 31 warnings. Here the agents delayed these warnings, either innocently through misunderstanding or wrongly through design to obtain psychological leverage.

Article 31(b), UCMJ, recites:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Paragraph 140a (2), *Manual For Courts-Martial, 1969 (Rev.)* (MCM) states, in pertinent part:

A statement is obtained in violation of Article 31(b) if, without an adequate warning under that article, a person subject to the code or acting as an instrument of such a person or a unit of an armed force obtained it by official interrogation or request, formal or informal, from one who in connection with the interrogation or request was accused or suspected of the offense to which the statement relates. A statement is obtained in violation of other warning requirements as to the right to remain silent if any other official or agent of the United Staes [sic] or of any State thereof or political subdivision of either, or someone acting as an instrument of such an official or agent, obtained it by custodial interrogation from an accused or suspect without having, before any questioning, warned him of his right to remain silent and that anything said by him could be used against him in court. . . .

. . . . .

A statement of an accused or suspect obtained from him in violation of any of the above warning requirements as to the right to remain silent or the right to counsel is considered to be involuntary, and therefore inadmissible against him, because of the violation alone, even if the accused or suspect knew that he had these rights despite the lack of warning. . . .

. . . . .

A statement obtained from an accused or suspect in an interrogation conducted in accordance with all applicable rules is not involuntary because that interrogation was preceded by one which was not so conducted, if it clearly appears that all improper influences of the preceding interrogation had ceased to operate on the mind of the accused or suspect at the time he made the statement. . . .

It is clear that the NIS agents are bound by these requirements.[2]

 There is no disagreement that "an investigative stop may be predicated on reasonable suspicion." *United States v. Gillis*, 8 M.J. 118, 120 (C.M.A.1979). The beard, the build and the T-shirt provided reasonable suspicion for the agents to accost appellant. Had the NIS agents been minimally prepared with required "paper" (presumably including rights acknowledgement forms), questions of identify, unit and recency of visits to NTC could have proceeded smoothly in a matter of seconds with minimal inconvenience to appellant and none to the agents. There is nothing to suggest the agents faced a hostile crowd of appellant's friends. Upon focusing of suspicion, which was found by the judge to have occurred, proper warnings should and could have followed easily. We fully affirm the judge's finding. It follows that appellant's statements and all the fruits derived therefrom are inadmissible if not independently based or otherwise purged of their tainted source.

Certain federal court decisions can mislead those dealing with military offenses. In *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the United States Supreme Court modified the reach of the rule created in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The accused in *Mathiason* was convicted, in a trial where his confession was essential to the prosecution case, after having moved to suppress the confession as the fruit of police questioning conducted without prior *Miranda* warnings. The trial and intermediate appellate court decided exclusion was unnecessary since the defendant was deemed not to have been "in custody" at the time he confessed. The Oregon Supreme Court reversed on a divided vote, concluding that although the appellant had not been arrested or formally detained, the interrogation occurred in a coercive atmosphere of the sort in which *Miranda* was intended to apply. The United States Supreme Court accepted *certiorari*, reversed and remanded, noting that *Miranda* was being read too broadly:

> In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½ hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the

---

**2.** We prescind from analysis of when and why appellant was actually a "suspect" since the military judge has factually ruled that the sta- tus existed when appellant was escorted into the sedan.

police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. *Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.* *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon v. Mathiason, supra,* 429 U.S. at 495, 97 S.Ct. at 713 (emphasis supplied).

 Welcome as these decisions are to those charged with prosecuting offenders, such decisions mislead military police, NIS and others in authority because Article 31(b), UCMJ, confers a greater protection to military personnel, a protection provided by virtue of a greater burden imposed on those "subject to the code or acting as an instrument of such a person", paragraph 140a (2), MCM. The NIS agent was required to "first [inform] him of the nature of the accusation and [advise] him that he does not have to make any statement...." Article 31(b), UCMJ. "The legislative background of the Article [31] shows that it was intended to protect persons accused or suspected of crime who might otherwise be at a disadvantage because of the military rule of obedience to proper authority." *United States v. Aronson,* 8 U.S.C.M.A. 525, 529, 25 C.M.R. 29, 33 (1957), citing *Gibson v. United States,* 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954).

 At oral argument, in an effort to demonstrate that L's testimony against appellant had a basis independent of L's discovery via appellant's illegal questioning, the appellate Government counsel urged us

to apply the law of *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); appellant also relies upon this case. We reject the Government's analysis. L's conviction by general court-martial prior to his testimony against appellant here was constrained by a pretrial agreement which required him to testify truthfully in this case. He was not, prior to his questioning by NIS, independently disposed to testify as was the florist shop employee, Miss H, in *Ceccolini.* Furthermore, there was no attenuation of the pressure created by appellant's interrogation on L's interrogation and L's subsequent testimony as would dissipate the force of official misconduct. Lastly, application of the exclusionary rule here will tend to prevent future irregular police conduct.[3] *See also United States v. Cruz,* 581 F.2d 535 (5th Cir. 1978) (*en banc*).

The testimony of L, an admitted accomplice, would not have been voluntarily forthcoming had he not been confronted as a result of his connection with appellant, with the description of the assailants and with his having been spotted on 23 August and noted, by name and ship with appellant, as they sat awaiting a bus. All of his testimony should have been excluded, *United States v. Hale,* 1 M.J. 323 (C.M.A.1976), as the fruit of illegal questioning and the illegal search of appellant's shipboard possessions. *See also United States v. Rollins,* 3 M.J. 680, 688 (N.C.M.R.1977).

Arrests without probable cause and detentions of persons under pretext in order to obtain prosecutorial leverage were discussed by a unanimous United States Supreme Court in *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (one justice not participating). In *Crews,* the conviction was upheld only because the Supreme Court found untainted, independently admissible evidence sufficient to establish identity and the elements of the offenses without reliance on evidence police developed via a cagily delayed warn-

---

**3.** Inasmuch as NIS agents worldwide have a central commander with authority to prescribe training and field procedures, decisions of this Court and the Court of Military Appeals may prompt corrective action more directly than civilian courts which contend with a myriad of local police departments.

ing and arrest. Such independently developed evidence also supported affirmation of a conviction in *United States v. Kesteloot*, 8 M.J. 209 (C.M.A.1980), in which the Court of Military Appeals affirmed this Court's action which viewed the appellant's girlfriend's admission as evidence obtained independently of that derived from an illegal search of her apartment and which found that Kesteloot's later confession flowed from knowledge of his girlfriend's inculpatory statements, not as fruit of the illegal search.

The military judge did not foreclose the Government from an opportunity to show that L could testify independently of his having been directly discovered as the result of unwarned questioning of appellant. The Government failed to do this, however, and no admissible evidence remains on which to affirm.

We cannot conclude without complimenting both trial and defense counsel for their superb and consistently professional advocacy in this case. The litigation of the extraordinarily close question of mental responsibility raised by appellant's erratic and felonious conduct following the sudden, near simultaneous, deaths of his sister and mother was superbly conducted; it clearly presented the views of four psychiatrists and three clinical psychologists.

The findings and sentence are set aside; the Charges are dismissed.

Chief Judge CEDARBURG and Judge FERRELL, concur.