UNITED STATES, Appellant,

v.

Roger C. LEIFFER, Ship's Serviceman
Seaman Recruit, U. S. Navy, Appellee.

No. 39643.
NCM No. 79–0407.

U. S. Court of Military Appeals.

July 26, 1982.

For Appellant: *Lieutenant Commander William A. Dorsey, JAGC, USNR* (argued); *Commander T. C. Watson, Jr., JAGC, USN, Captain Craig L. Kemmerer, USMCR* (on brief).

For Appellee: *Lieutenant Lynn M. Maynard, JAGC, USN* (argued); *Lieutenant Commander Lawrence W. Muschamp, JAGC, USN* (on brief).

## OPINION OF THE COURT

COOK, Judge:

Despite his pleas, the accused was convicted by general court-martial of attempted robbery, robbery, sodomy, assault and battery, and wrongful appropriation, in violation of Articles 80, 122, 125, 128, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 922, 925, 928 and 921, respectively. The sentence adjudged included a bad-conduct discharge, confinement at hard labor for one year, and forfeiture of all pay and allowances. The convening authority set aside the findings and sentence because of an error committed by the military judge and ordered a rehearing. At the rehearing the accused was again convicted of the same offenses despite his pleas, and received the same sentence. A different convening authority approved the findings and sentence but subsequently remitted part of the forfeitures after 19 March 1979. The United States Navy Court of Military Review set aside the findings and dismissed the charges against the accused on the ground that the testimony of the principal Government witness at trial should have been suppressed. 10 M.J. 639 (1980). After a motion for reconsideration was denied, The Judge Advocate General of the Navy certified the following question to us:

WHETHER THE NAVY COURT OF MILITARY REVIEW WAS CORRECT, AS A MATTER OF LAW, WHEN IT DETERMINED: (1) THAT THE FAILURE TO ADVISE THE ACCUSED OF HIS ARTICLE 31(b), UCMJ, 10 U.S.C. § 831(b), RIGHTS IN A TIMELY MANNER RENDERED INADMISSIBLE THE SUBSEQUENT TESTIMONY OF A PROSECUTION WITNESS; AND (2) THAT THE GOVERNMENT FAILED TO SHOW THAT ITS DISCOVERY OF THAT WITNESS' IDENTITY AND RELATIONSHIP WITH THE ACCUSED HAD AN INDEPENDENT BASIS?

We answer the certified question in the negative.

■ While this Court cannot review the findings of fact of courts below where they are reasonably supported by the evidence of record, *United States v. Quintana*, 5 M.J. 484 (C.M.A.1978); *United States v. Carmichael*, 21 U.S.C.M.A. 530, 45 C.M.R. 304 (1972), we can, however, review the questions of law occasioned by the legal connotations placed upon those facts by lower courts. *United States v. Kesteloot*, 8 M.J. 209 (C.M.A.1980); *United States v. Lowry*, 2 M.J. 55 (C.M.A.1976). We are here restricted to the evidence admitted by the military judge on the basis of certain limitations he imposed.

Special Agent Richard L. Lucas of the Naval Investigative Service (NIS) assigned to the Naval Investigative Service Resident Agency (NISRA), Naval Training Center (NTC), San Diego, California, testified that on August 30, 1977, he was the chief agent of a team which was watching the NTC enlisted men's club, the petty officer club, and the bowling alley looking for two men who had assaulted and robbed other NTC personnel on two previous nights (August 16–17 and 23). One of the assailants had a beard and the other, who was "thinner and slightly taller," did not. When the accused left the club, one of the agents said, "There's a guy with a beard now." Agent Lucas responded that he did not believe accused resembled the composite drawing made up from victims' descriptions because

accused appeared to be taller and "his hair was parted in the middle" instead of on the right side. Also, accused's companion did not fit the description of the robber's accomplice. The agents then agreed that one of them, Special Agent Simon, would follow the accused. Agent Simon came upon the accused and his companion where they had been stopped by the Shore Patrol for urinating in public, and Simon "decided to go . . . [ahead] and conduct a field interview since they had been stopped already." Within five minutes, Agent Simon summoned Agent Lucas and told him, "Take a look at . . . [accused's] shirt." Accused was wearing a yellow shirt bearing the inscription "Led Zeppelin in Concert" on the front which matched a victim's description of the shirt worn by his assailant.

Agent Lucas then asked the accused "if he would accompany" him "to the [NISRA] office for a further interview." While Agent Lucas did not consider accused to be a suspect because he did not fit the composite description, he wanted to ask him certain questions. He said he asked accused to go to his office because he did not have any note paper with him in the car. Accused "was a little hesitant" and "wanted to know how long it would take." Lucas "told him that it shouldn't take too long" and said "that he was wearing an item of clothing . . . and had a beard like a man . . . [they] were looking for in [connection with] some robberies on the base." Accused then agreed to accompany Special Agent Lucas to the NISRA office.

When they arrived, Agent Lucas asked accused for "his full identification . . . ; his name; his rate; his social security [number]; date and place of birth; what ship he was off of" and "when was the last time he was at NTC." Accused responded "that he was at the EM Club the last time that Mad Dog played" and "that he always trie[d] to make it to Mad Dog and sit right next to the band because he knows some of the band members." Agent Lucas knew that Mad Dog's last appearance at the NTC EM Club had been on the same night as the last assault and that the victim had first met his

assailants "in the Club sitting right next to the band." At this point, Agent Lucas excused himself and went to get an acknowledgment and waiver of rights form because he "felt" the time had come to "give . . . [accused] his Article 31 Rights."

While he was out of the interview room, Agent Lucas was told by Special Agent Larabee that the accused was one of the men they had interviewed the previous week at a bus stop. Lucas then went through his notes and found a piece of paper that had been given to him the previous week by Agent Larabee bearing the names "Leiffer," "Lamphear," and the "USS Monticello."

> Upon his return, he advised the accused that he was suspected of robberies and assaults, and that he had the right to remain silent and make no statement whatsoever and that anything he did say could and would be used against him in a trial by court-martial; that he had the right to consult with an attorney prior to any questioning; this could either be a civilian attorney retained by him at his own expense or military attorney would be appointed to represent him free of charge by his command.

> [T]hat he had the right to have the attorney, whether civilian or military, there during the entire interview.

> And also that he had the right to terminate the interview at any time for any reason.

Agent Lucas "got more of . . . [accused's] background including how tall he was; his weight. If he had any scars, marks or tattoes [sic]." He learned "that . . . [accused] did have a scar somewhere around . . . one of his eyes"; "that he was a boxer and had experience in the ring." This last bit of information was pertinent to certain descriptions offered by previous assault victims.[1] However, accused denied having participated in the crimes and the interview was terminated.

Agent Lucas asked the accused for permission to search his personal belongings on board the USS MONTICELLO, accused's duty station, and accused refused. Agent Lucas then called the ship's Command Duty Officer and notified him that a request for authority to search the accused's belongings was being prepared for his perusal. It was Agent Lucas' intention to look for other items of clothing described by the victims as having been worn by their assailant.

When Agent Lucas and the accused arrived at the USS MONTICELLO, he told the Duty Officer that there were two people assigned to the ship to whom he wished to speak and gave their names to the Duty Master-at-Arms to check. One of the men was aboard the ship and was interviewed. The second person, Lamphear, was not aboard, but the Master-at-Arms did determine that Lamphear was a member of the crew and that his first name and middle initial were "Larry L." Agent Lucas remembered that one of the men involved in the robbery on August 16 had called his companion "Larry." The Duty Officer "stated that he did know . . . [accused] and knew that he was the boxer . . . and signed the Command Authorization for Search." During the subsequent search, "a black windbreaker with a patch that said, 'Cat Diesel Power'" and "some blue running shoes with white stripes" were discovered among accused's belongings. These items had been identified by victims as having been worn by their assailants.

The next day, Lamphear was interviewed and made a statement incriminating himself and the accused. Upon being confronted with Lamphear's statement, the accused eventually confessed his involvement in the several incidents which led to the charges upon which he was tried.

At the pretrial hearing, the defense made various motions to suppress evidence. Although the evidence had not been formally offered at that time, the military judge stated:

> believed that one of the assailants might have had boxing experience.

---

1. One victim had been struck a blow which broke his jaw and another victim described his assailant as moving like a boxer. Agent Lucas

It is the opinion of this court on the evening of 30 August 1977 when Special Agent Lucas was called over to the vicinity of the accused and he observed him wearing the yellow "Led Zeppelin in Concert" t-shirt, the accused was a suspect within the meaning of Article 31, UCMJ, and was entitled to be warned of his rights. All statements made by the accused between that time and the time of his first Article 31 warning at the NIS office are inadmissible by reason of his failure to be properly warned.

It is the opinion of this court that the warning given to the accused later that night was tainted by the prior illegally obtained statements and that the taint had not been overcome or removed.

It is the opinion of this court that the search for and seizure of certain items on board the Monticello and listed on Prosecution Exhibit 6 for Identification are tainted by the prior illegal statements.

It is the opinion of this court that considering the totality of the circumstances which had occurred since 2300, 30 August 1977, the responses of the accused to Special Agent Larabee when he read Lamphear's statement to the accused were not solely the product of Lamphear's statement but were partly induced by the previously illegally obtained statements and seized evidence.

It is the opinion of this court that Lamphear's identity was discovered as a result of the information illegally obtained on the evening of 30 August 1977.

It is the opinion of this court that the statement of Wisner relating to the sodomy charge was obtained through Lamphear whose name was discovered as a result of the information illegally obtained on the evening of 30 August.

Airman Recruit Bruno's testimony concerns an incident which occurred on 19 August 1977 and which is not the subject of any charges before this court. It is the opinion of this court that while such testimony may have some slight tendency to link this accused with the offenses charged, its potential prejudicial impact far outweighs any probative value it may yield.

It is the opinion of this court that with respect to Gregory, Fowler, Ehrlich and Baker, there was no impropriety in connection with the out-of-court line-up conducted on 31 August 1977 which would prohibit them from attempting to make an in-court identification of the accused in this case.

Gentlemen, I have not ruled on these motions because, in my opinion, since they are essentially objections to evidence expected to be introduced, they require no ruling until such time as the evidence is to be introduced. That is why I have rendered opinions and not rulings. Therefore, as a result of the opinions of this court, I consider the motions at this time to be moot and require no further disposition.

. . . . .

It is the opinion of this court that Lamphear's identity was discovered as a result of the information illegally obtained from the accused on the evening of 30 August 1977.

And, it is the opinion of this court that considering the totality of these circumstances which have occurred since 2300, 30 August 1977, the responses of the accused to Special Agent Larabee when he read Lamphear's statement to him were not solely the product of Lamphear's statement but were partly induced by the previously illegally obtained statements and seized evidence.

Pursuant to these "opinion[s]," the evidence was not placed before the court, but Lamphear was permitted to testify. As noted above, the findings of guilty were set aside by the convening authority and a rehearing was ordered because of an error committed by the trial judge. At the rehearing, both counsel prepared a stipulation as to the "law of the instant case" based upon the opinions of the military judge at the first trial. The military judge accepted the stipulation with the proviso that it would not restrict his ability to make new rulings, depending on the evidence

presented at the rehearing. After various motions were made to suppress testimony, the military judge again "issue[d] opinions for the guidance of counsel in connection with the introduction of evidence":

First of all, this Court will make this finding, that is, the Court finds that on the 30th of August 1977, the accused accompanied Special Agent Lucas from the vicinity of the EM Club to the NIS Office voluntarily and was not under apprehension.

Here are the opinions that are based upon the evidence presented to the Court during the hearing on Appellate Exhibit VI as they relate to the relief requested by the accused in that motion.

It is the opinion of this Court that on the evening of 30 August 1977 when Special Agent Lucas was called over to the vicinity of the accused and he observed him wearing the yellow "Led Zeppelin in Concert" t-shirt, the accused was a suspect within the meaning of Article 31, UCMJ, and was entitled to be warned of his rights. All statements made by the accused between that time and the time of his first Article 31 warning at the NIS Office are inadmissible by reason of his failure to be properly warned.

It is the opinion of this Court that all subsequent statements made by the accused were also tainted and the taint had not been overcome or removed.

It is the opinion of this Court that the search for and seizure of certain items on board the Monticello and listed on Appellate Exhibit VI–C were tainted by the prior illegal statements.

It is the opinion of this Court that Lamphear's identity was discovered as a result of the information illegally obtained on the evening of 30 August 1977.

It is the opinion of this Court that the statement of Wisner relating to the sodomy charge was obtained through Lamphear, whose name was discovered as a result of the information illegally obtained on the evening of 30 August 1977.

It is the opinion of this Court that the testimony of Seaman Recruit Lamphear and Seaman Apprentice Wisner would not be precluded by the two opinions I have just rendered.

It is the opinion of this Court that Seaman Thomas' identity was not discovered as a result of any information illegally obtained on 30 August 1977 or derived therefrom.

I believe those opinions and findings provide guidance with regard to the production of testimony that has been requested by the accused to be suppressed.

The United States Navy Court of Military Review agreed with the "opinion[s]" of the military judge that Agent Lucas' failure to give an advisement of rights prior to asking him any questions tainted "all subsequent statements" by the accused [2] and the search for and seizure of items on board the USS MONTICELLO. However, unlike the trial judge, the Court of Military Review went further and also excluded the testimony of Lamphear. In so doing, that court committed the *post hoc ergo propter hoc* fallacy [3] and disregarded the teaching of the Supreme Court "that the question of causal connection . . . [between illegal acts and evidence sought to be suppressed] is not to be determined solely through the sort of analysis which would be applicable in the physical sciences . . . [nor solely] on the basis of causation in the logical sense alone, but necessarily includes other elements as well." *United States v. Ceccolini*, 435 U.S. 268, 274, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978).

Turning to the critical evidentiary facts, our first point of departure from the court below concerns the initial stopping of the

---

2. As we note *infra,* for the purposes of Article 31(b), Uniform Code of Military Justice, 10 U.S.C. § 831(b), a suspect's identity is not a "statement" and presumably the military judge's reference to "statements" did not include the accused's identification of himself.

3. "After this, therefore because of this"; the logical fallacy arises from the substitution of chronological sequence for causal relationship.

accused.[4] At that moment, the investigators had accumulated certain investigatory information and possessed:

(1) An approximate physical description of the assailants (one was bearded, stocky, 5-feet-9-inches tall, hair parted on the right side; the other was taller and of slighter build);

(2) Information as to the assailants' clothing (yellow t-shirt bearing the inscription "Led Zeppelin in Concert"; a blue windbreaker with a "Cat Diesel Power" patch on it; blue running shoes with white stripes);

(3) Some information about the events that took place on the base on the nights when the offenses were committed (Tuesday nights when the group Mad Dog performed; one rainy night); and,

(4) Information regarding certain other details (assailant sat near the band at the NTC EM Club, accompanied on one occasion by a third person in a "salt and pepper" Navy uniform).

With this background of factual information we examine the professed motives of the investigators.

█ It was the accused's beard that attracted the investigators' attention to him on August 30 and that only led them to conduct surveillance of him as he was leaving the area of the club. However, when it was discovered that he was wearing a Led Zeppelin shirt, Agent Lucas was motivated to approach him for additional information. Although Agent Lucas maintained that the discrepancies in height and the position of the part in the accused's hair kept him from considering the accused a "suspect" and, hence, not meriting an advisement of his rights, we must apply an objective standard to this situation. As we said in *United States v. Anglin*, 18 U.S.C.M.A. 520, 40 C.M.R. 232 (1969): "The facts and circumstances of each case determine if an accused is, at the time of interview, a *suspect* and, therefore, entitled to the full protection of the law relating to self-incrimination." *Id.* at 523, 40 C.M.R. 235. Like the investigator in *Anglin*, Agent Lucas was "a mature, knowledgeable, and sophisticated investigator who, despite his disclaimer to the contrary, had every reason to suspect the accused."[5] *Id.* Hence, we cannot say that the ruling of the military judge was at odds with our precedents. *Cf. United States v. Schafer*, 13 U.S.C.M.A. 83, 32 C.M.R. 83 (1962); and *United States v. Hopkins*, 7 U.S.C.M.A. 519, 22 C.M.R. 309 (1957).

█ However, that does not end our consideration, for the question remains as to the effect of the failure to give warnings prior to interrogating the accused. The military judge correctly found that the accused voluntarily accompanied Agent Lucas to the NISRA office and was not under apprehension.[6] There, Lucas obtained from

---

4. There is no question that the investigators had sufficient information to make an investigatory stop, even if they did not have probable cause to arrest. *See Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1 (1968); *District of Columbia v. M. M.*, 407 A.2d 698 (D.C.C.A. 1979).

5. In *United States v. Henry*, 21 U.S.C.M.A. 98, 100, 44 C.M.R. 152, 154 (1971), this Court held:

Information available to the investigator may so clearly identify the conduct as criminal and a person as the wrongdoer as to require threshold advice to the individual regarding his right to remain silent; in other instances, the investigator may have no reason to anticipate or suspect that a person from whom he seeks information is implicated in a crime. Thus, the conclusion as to criminality or suspicion in a particular case depends on the totality of the surrounding circumstances.

6. Agent Lucas repeatedly maintained that he did not force the accused to accompany him to the NISRA office and that his only reason for not questioning the accused on the street was that he did not have any note paper and that he was uncomfortable in the street environment. We find nothing improper in this act. *United States v. Chatman*, 573 F.2d 565 (9th Cir. 1977); *United States v. Salter*, 521 F.2d 1326 (2d Cir. 1975). The question of whether police conduct constitutes an arrest is "not ... what the defendant himself ... thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." *United States v. McKethan*, 247 F.Supp. 324 (D.D.C.1965), quoted with approval in *Coates v. United States*, 413 F.2d 371, 373 (D.C.Cir.1969); *see also United States v. Men-*

accused "his full identification, name, rate, social security number, date and place of birth, his duty station." Article 31(b), UCMJ, 10 U.S.C. 831(b), is applicable only to "any statement regarding the offense of which he is accused or suspected." But, "[d]isclosure of name and address is an essentially neutral act." *California v. Byers*, 402 U.S. 424, 432, 91 S.Ct. 1535, 1540, 29 L.Ed.2d 9 (1971). As Chief Judge Everett said in *United States v. Davenport*, 9 M.J. 364 (C.M.A.1980): "A statement of a person's identity is not 'regarding' any offense. Indeed, one's identity is not an element of a crime; nor does it tend to prove a crime." *Id.* at 369. Thus, the disclosure of the accused's identity, even prior to warning, was not excludable by virtue of Article 31.[7]

■ Agent Lucas' next question, although innocent enough in its context, falls into a different category. When the accused responded with the information that the last time he had been "on board" the station was to attend the previous Mad Dog concert, Agent Lucas, at that point, considered him to be a suspect and went out of the office to find a form for advisement and waiver of rights. We are compelled to conclude that this decision came one question too late and that the failure to advise accused of his rights had been postponed too long. Ironically, it was at that same time that Agent Lucas was reminded by Agent Larabee of the connection between the accused and Lamphear; the date of the previous interview; and the name of the accused's ship. Thus, while the accused's answer is tainted by the agent's failure to properly warn him of his rights, the

Government already had in its possession the same information from a different, untainted source. *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Unless it could be held that the mere fact that accused was present at the NISRA office was suppressible, the connection between him and Lamphear is sufficiently attenuated. *Nardone v. United States, supra.* The accused "is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct." *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980).[8]

While we need not concern ourselves with the search of the accused's belongings on board the MONTICELLO since the military judge suppressed all the evidence produced by the search, there was evidence independent of the search which was not illegally tainted. The first name and middle initial of Lamphear were provided from the ship's records, and the accused was identified by the ship's Duty Officer as a boxer.

■ When Lamphear returned the following day, two lineups were conducted with apparently inconclusive results. However, Lamphear eventually confessed, implicating the accused. Faced with his confederate's admission of guilt, the accused also confessed. Consistent with his earlier rulings, the military judge suppressed both confessions; however, he did permit Lamphear to testify against the accused at tri-

---

denhall, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *United States v. Berry*, 670 F.2d 583 [5th Cir. 1982]; *Gomez v. Turner*, 672 F.2d 134 (D.C.Cir.1982).

7. Such information is required to be given even to a capturing enemy by Article 17 of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949 (*Date of entry into force with respect to the United States of America: February 2, 1956*), 6 UST 3316, 3330, TIAS 3364 (excluding unit of assignment which is not required to be disclosed for obvious reasons in that context). *See also*

*United States v. Lloyd*, 10 M.J. 172 (C.M.A. 1981).

8. The quotation is from the majority opinion. However, in the following section (joined by two other Justices) the question of whether an accused's person should be considered evidence and, hence suppressible, was reserved. *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). The other five Justices would have decided the question adversely to the accused, but in differing ways. *Id.* at 477–78, 100 S.Ct. at 1253.

al.[9] We find that decision was correct.[10] Lamphear's identity was known to the NIS agents before the accused was questioned. The accused never mentioned Lamphear's name prior to his own confession. Thus, the production of Lamphear as a witness at trial was free from whatever taint might have affected accused's confession. The exclusionary rule demands no more.[11] *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

Except for Agent Lucas' failure to warn the accused at the moment of their first encounter, the case reveals only competent and diligent police work.[12] It would be absurd to suppress all evidence against the accused, whether derived from his statement or not, solely because it followed the initial illegality.

> [W]e must weigh the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce. In this particular case we also "must consider society's interest in the effective prosecution of criminals in light of the protection our pre-*Miranda* standards afford criminal defendants." ... These interests may be outweighed by the need to provide an effective sanction to a constitutional right ... but they must in any event be valued. Here respondent's own statement, which might have helped the prosecution show respondent's guilty conscience at trial, had already been excised from the prosecution's case ... To extend the excision further under the circumstances of this case and exclude relevant testimony of a third-party witness would require far more persuasive arguments than those advanced by respondent.

*Michigan v. Tucker, supra* at 450–51, 94 S.Ct. at 2367.

The certified question is answered in the negative. The decision of the United States Navy Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Navy for submission to that court for further review pursuant to Article 66, UCMJ, 10 U.S.C. § 866.[13]

---

**9.** *See Smith v. United States*, 324 F.2d 879, 881–82 (D.C.Cir.1963) (Burger, J.) (footnotes omitted), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964), which states:

> The proffer of a living witness is not to be mechanically equated with the proffer of inanimate evidentiary objects illegally seized. The fact that the name of a potential witness is disclosed to police is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.

Quoted in *United States v. Ceccolini*, 435 U.S. 268, 277, 98 S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978).

**10.** The military judge gave no reason for his "opinion" permitting Lamphear to testify and it does appear facially inconsistent with his other "opinions." However, "[i]n the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937). Even if "[t]he reason for denial of the motion to suppress is unclear ..., if proper for any reason it will be affirmed on appeal." *United States v. Allen*, 629 F.2d 51, 57 (D.C.Cir.1980).

**11.** *See McGuire v. United States*, 273 U.S. 95, 99, 47 S.Ct. 259, 260, 71 L.Ed. 556 (1927), where it is stated:

> A criminal prosecution is more than a game in which the government may be checkmated and the game lost merely because its officers have not played according to rule.

**12.** If the primary purpose of the exclusionary rule is deterrence of police misconduct, we believe that

> [a]pplication of the exclusionary rule in this situation could not have the slightest deterrent effect on the behavior of an officer such as ... [Lucas]. The cost of permanently silencing ... [Lamphear] is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.

*United States v. Ceccolini, supra* at 280, 98 S.Ct. at 1062.

**13.** Since the Court of Military Review reversed the findings of guilty on this one issue, it may not have considered other issues asserted by

EVERETT, Chief Judge (concurring):

The trial judge did not attempt to reconcile on the record his "opinion" that Lamphear's testimony was inadmissible with his other "opinions." Thus, unfortunately, we must speculate about his rationale for admitting Lamphear's testimony. Nonetheless, I am convinced his ruling was correct.

The starting point is the judge's "finding" that "the accused accompanied Special Agent Lucas from the vicinity of the EM Club to the NIS Office voluntarily and was not under apprehension." Once having arrived there, he was asked some questions before receiving an Article 31 (Uniform Code of Military Justice, 10 U.S.C. § 831) warning. In the trial judge's "opinion," all subsequent "statements" by the accused were inadmissible. That "opinion" probably is binding upon our Court and other reviewing authorities. *See United States v. Morris*, 13 M.J. 297 (C.M.A.1982) (Everett, C. J., concurring in the result). Moreover, even if it were examined *de novo*, that "opinion" at the least is not clearly erroneous. However, a question as to identity falls outside the purview of the Article 31(b) warning requirement. *United States v. Davenport*, 9 M.J. 364, 369 (C.M.A.1980). Therefore, construing the trial judge's "opinion" in context, I infer that he did not intend to rule that, despite the absence of a warning, appellee's self-identification in response to a question was inadmissible.

Therefore, Leiffer's presence at the NIS Office and knowledge of his identity were lawfully obtained. At that point the investigators possessed information which set in motion a process which would have led inexorably to the discovery of Lamphear, even if appellee had received an Article 31 warning and had remained silent thereafter.[1] The unwarned statements by appellee to the NIS investigators did not mention

the accused. Our action here is related only to the certified issue before us.

1. Ironically, if Leiffer had refused to talk to the agents, his silence undoubtedly would have caused the investigators to seek further information about him from his associates; since at

Lamphear and were not the reason his information—and ultimately his testimony—came to light. Accordingly, I join Judge Cook in concluding that, under recent Supreme Court precedents, the exclusionary rule did not require exclusion of Lamphear's testimony at appellee's trial. It follows that I answer the certified question in the negative and join in remanding the case to the United States Navy Court of Military Review for further proceedings.

FLETCHER, Judge (concurring in the result):

The Court of Military Review found that the police misconduct in this case was the criminal investigator's failure to give appellant the warnings required by Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. As a result of this *Miranda*[1]-type violation, it found inadmissible his initial unwarned statements, his subsequent statements after warnings were given, the items discovered as a result of a search based in part on his statements, and the testimony of a third party whose identity was discovered as a result of his unwarned statements. The propriety of its finding concerning the inadmissibility of the testimony of Lamphear is the subject of our review.

The Court of Military Review assumed that derivative evidence in the form of the testimony of a third-party witness must be excluded if it is secured as a result of a violation of Article 31(b). It then concluded that none of the established exceptions to the exclusionary rule were shown by the Government to be applicable to the present case. Unlike my Brother judges, I find there is sufficient evidence in the record of trial to support the lower court's factual finding of causal connection. Moreover, I find its findings of fact sufficient to support its legal conclusions that the various exceptions to the exclusionary rule were not

the time of the "field interrogation" Lamphear was known to have been with appellee on August 23, he would have been contacted immediately by NIS.

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

shown by the Government to be applicable to the present case.

Yet, I am not convinced as a matter of law that the exclusionary rule of Article 31(d) extends to evidence, in the form of testimony from a third-party witness, which is derived from failure to advise an accused as required by Article 31(b). *Cf. United States v. Solomon,* 17 U.S.C.M.A. 262, 266, 38 C.M.R. 60, 64 (1967); *United States v. Haynes,* 9 U.S.C.M.A. 792, 27 C.M.R. 60 (1958). Moreover, I have serious doubts whether the lower court's exclusive reliance on principles of attenuation found in fourth amendment violation cases was legally correct. Accordingly, I cannot affirm the lower court's ruling.

Article 31(d) states:

No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

Review of the legislative history of this codal provision indicates that Congress intended that statements or evidence obtained from a suspect be suppressed as a result of a violation of Article 31.[2] As indicated earlier, the statements and the items of evidence discovered in the search of appellant's property were excluded by the trial judge. I do not believe that the testimony of Lamphear can likewise be considered as

a matter of law either a statement or evidence obtained from appellant. *See Michigan v. Tucker,* 417 U.S. 433, 448–49, 94 S.Ct. 2357, 2365–66, 41 L.Ed.2d 182 (1974); *see also* paras. 140*a* and 150*b,* Manual for Courts-Martial, United States, 1969 (Revised edition); E. Imwinkelried, P. Gianelli, F. Gilligan, and F. Lederer, *Criminal Evidence* 351–55 (1979). *Cf.* Analysis of Mil.R. Evid. 304, Manual, *supra.*

Even assuming my interpretation of Article 31(d) is incorrect, I do not believe the lower court should have exclusively relied on fourth-amendment-violation cases to determine the attenuation of the taint of this *Miranda*-type violation.[3] *See Michigan v. Tucker, supra* at 445 n. 19, 94 S.Ct. at 2364 n. 19. Since appellant's right against self-incrimination is at stake in the suppression of this testimony, not his right to privacy,[4] distinct policies and interests must be considered. *See Brown v. Illinois,* 422 U.S. 590, 600–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975). There may be some congruity in these analyses but they are not identical. *See Michigan v. Tucker, supra* at 446–47, 94 S.Ct. at 2364–65. *See also United States v. Ceccolini,* 435 U.S. 268, 278, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978).[5]

Accordingly, I would also return this case to the Court of Military Review to reconsider its ruling in light of *Michigan v. Tucker, supra.*

---

2. Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., Index and Legislative History, Uniform Code of Military Justice, p. 984 (1949).

3. The Court of Military Review did not find any primary violation of appellant's fourth amendment rights in this case. Moreover, it suppressed the items of evidence discovered in the search of appellant's property because the search was tainted as a result of the violation of Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831.

4. The Court of Military Review relied on our decision in *United States v. Hale,* 1 M.J. 323 (C.M.A.1976). The primary police misconduct in that case was an unlawful search. The lower court also relied on *United States v. Rollins,* 3 M.J. 680 (N.C.M.R.1977), which was based on an unlawful arrest.

5. *See generally* Note, *Moving to Suppress the Exclusionary Rule: The Use of Illegally Obtained Evidence as the Basis for Probable Cause,* 60 B.U.L.Rev. 713, 724–27 (1980).